UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROGELIO BARRON and MARIA | § | No. 5:18–CV–1184–DAE |
| BARRON, individually and on behalf of | § | |
| ANTHONY BARRON, Deceased, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

ORDER GRANTING MOTION TO DISMISS; DENYING AS MOOT
MOTION FOR SUMMARY JUDGMENT

Before the Court is a Motion to Dismiss and, in the Alternative,

Motion for Summary Judgment (Dkt. # 52), filed by the United States of America

("Government"). Pursuant to Local Rule CV-7(h), the Court finds this matter

suitable for disposition without a hearing. For the reasons stated below, the Court

**GRANTS** the Government's motion to dismiss. (Id.)

BACKGROUND

This case concerns the tragic death of Anthony Barron ("Barron") in a

flash flood while he was driving to work on Camp Bullis in Bexar County, Texas

on the morning of October 30, 2015. Camp Bullis—which is part of Joint Base

San Antonio ("JBSA")—is a military installation and training camp on nearly

28,000 acres of land owned and operated by the United States Army. (Dkt. # 37

1

¶ 8; www.sanantonio.gov/oma/campbullis (last accessed Apr. 1, 2021).)  Barron

was a civilian contractor who performed janitorial services on Camp Bullis.

(Dkt. # 37 ¶ 9; Dkt. # 54 at 1.)

### 1.  Low-Water Crossings on Camp Bullis

Camp Bullis contains multiple low-water crossings on its roads,

including two that are particularly relevant to this case—one on Camp Bullis Road,

the primary path for north-south travel from the cantonment area[1] to the firing

range and hunting areas, just south of its intersection with Wilderness Trail

("Camp Bullis Road Crossing"), and another to the east of Camp Bullis Road on an

unnamed road that serves as an alternative north-south route to Camp Bullis Road

and also is located just south of an intersection with Wilderness Trail ("Subject

Crossing").  (Dkt. # 52-4 at 22, 38–39; Dkt. # 54-2 at 22, 83–84.)  When locked

and closed[2]—as it usually is to keep people from either going downrange to the

---

[1] The cantonment area is a developed, quasi-residential segment of Camp Bullis
with its own fire station, restaurants, and hotel.  (Dkt. # 54 at 15.)

[2] Sergeant Tracy Goodlow testified that three entities have keys to this gate: Range
Control, Civil Engineering, and the Fire Department (which is still under the
authority of the U.S. Department of Defense).  (Dkt. # 54-2 at 39, 88; Dkt. # 54-3
at 16.)  However, Fire Chief Thomas Gaffney believes Security Forces—an entity
he claims has "military and civilian police officers"—have a key as well.  (Dkt.
# 54-3 at 16, 31.)

"Impact Area" (Dkt. # 54-2 at 36) or accessing a water treatment plant[3] (Dkt. # 52-4 at 24–25)—a double-gate blocks access to the Subject Crossing from the cantonment area, leaving Camp Bullis Road as the only north-south path between the cantonment area and north side of Camp Bullis.  (Id. at 21–22.)  However, on some occasions prior to the date in question, Camp Bullis employees, including Conservation Officer[4] Archie Lee Cooper III ("Cooper"), used the Subject Crossing for north-south travel when Camp Bullis Road itself was overrun with water, meaning (1) at least sometimes when the Camp Bullis Road Crossing flooded the Subject Crossing remained traversable, and (2) on such occasions, the gate might be open to facilitate such travel.[5]  (Dkt. # 52-4 at 7–8; Dkt. # 54-2 at 42.)

---

[3] "Range" and "Controlled Area" are not separately defined in Camp Bullis Regulation 350–1 ("Reg. 350–1").  But in a revised version, enacted in 2016, this provision was streamlined to refer only to the "Impact Area."  See Army Support Activity Reg. 350–1, § 2-3 (dated Aug. 1, 2016) https://home.army.mil/ samhouston/application/files/2615/5173/9707/ASA_350-1.pdf (last accessed Apr. 1, 2021).  While there is no evidence that the Subject Crossing itself is within the "Impact Area," it is indisputably located on the same side of the double-gate as the "Impact Area."  (See Dkt. # 54 at 4.)

[4] This position is similar to that of a game warden.  (Dkt. # 52-4 at 5.)

[5] As explained in more detail below, the evidence suggests this is likely not why the gate was open on the morning of October 30, 2015, because Security Forces did not close the Camp Bullis Crossing until 6:55 a.m. while deposition testimony suggests the gate was open prior to that.

### 2.  Camp Bullis Employees on October 30, 2015

Throughout the pre-dawn hours and into the morning of October 30, 2015, Camp Bullis and its surrounding area experienced heavy, sustained rain and flooding.  (Dkt. # 37 ¶ 14; Dkt. # 52-4 at 6, 17–18; Dkt. # 54-2 at 9.)  Sometime between 6:15 and 6:45 a.m., Wayne Lorenzo Evans ("Evans"), a Range Control[6] employee at Camp Bullis, passed the Subject Crossing in his Honda CRV (a sports utility vehicle or "SUV").  (Dkt. # 52-4 at 20.)  The gate was already open when Evans reached it that morning.[7]  (Id. at 19, 22, 24.)  Despite low visibility and fast-moving water on the road—worse than he had seen on any day prior—Evans made it safely across the Subject Crossing in his vehicle.  (Id. at 20–21, 34.)  He did not feel like his decision to attempt to cross was unreasonable.  (Id.)

Around 6:55 a.m., Security Force Officer Jarvis Rogers ("Officer Rogers") closed the Camp Bullis Road Crossing using Jersey barriers at the direction of Sergeant Tracy Goodlow ("Sergeant Goodlow"), who saw heavy waterflow on the road.  (Dkt. # 52-4 at 35.)  After alerting dispatch, Sergeant Goodlow headed west to survey another crossing located upstream from Camp

---

[6] Range Control is, among other things, the "central point of control[, responsible for] coordination for access to the Impact Area and the air space," and "operate[s] . . . as the Emergency Operations Center for training emergencies."  (Dkt. # 52-3 at 11.)

[7] No party or witness has identified the person(s) who opened the gate before Evans crossed the Subject Crossing that morning.

Bullis Road in an area with relatively high traffic volumes.  (Id. at 73–74; Dkt. # 54-2 at 39.)  Sergeant Goodlow planned to return east to the Subject Crossing— which is downstream from the Camp Bullis Road Crossing—after checking the upstream higher-volume crossings.  (Dkt. # 54-2 at 22, 41, 44–45, 54.)  However, at approximately 7:25 a.m., before he ever made it to another crossing, Sergeant Goodlow received a radio call regarding a possible missing person in a vehicle in the cantonment area.  (Id. at 28.)  Officer Rogers also headed west from Camp Bullis Road after blocking the Camp Bullis Road Crossing and had time to check a few crossings; however, Officer Rogers said he "wouldn't have thought about" returning to the Subject Crossing for inspection because he "very seldom go[es] over there" and "it's normally locked."  (Dkt. # 54-4 at 39–42.)

### 3.  Safety Features and the Subject Crossing

The Government is required to ensure traffic signs on military bases conform to the Manual on Uniform Traffic Control Devices for Streets and Highways ("MUTCD").  32 C.F.R. § 634.4(h)(3); (see Dkt. # 52-1 ¶ 4).  The Subject Crossing was not marked by a "ROAD MAY FLOOD" sign or a flood gauge on October 30, 2015.  (Dkt. # 52 at 17 n.13; Dkt. # 52-4 at 9.)  Officer Rogers does not recall ever checking the Subject Crossing on past occasions when Camp Bullis flooded and—although Sergeant Goodlow acknowledged the Subject Crossing is in a "flood-prone area" downstream from the Camp Bullis Road

Crossing (see also Dkt. # 54-8 at 3)—Cooper stated that the Subject Crossing itself often provided a viable alternative to Camp Bullis Road when flash floods were a risk because its "culverts below the road surface help aid in the drainage there." (Dkt. # 52-4 at 7; Dkt. # 54-2 at 41; Dkt. # 54-4 at 43–44; see also Dkt. # 54-8 at 2.)

In the opinion of Chief Jason Cowin ("Chief Cowin") of the Army's Traffic Engineering Branch under the Infrastructure Division of the Military Surface Deployment and Distribution Command, Transportation Engineering Agency ("SDDCTEA"), the Subject Crossing did not need a "ROAD MAY FLOOD" sign because it was not subject to frequent flooding—a term not defined in the MUTCD.  (Dkt. # 52-1 ¶¶ 3–8.)  Chief Cowin noted that the MUTCD, as well as the Department of Defense's Unified Facilities Criteria ("UFC") advise conservative use of such warning signs when not required so that the signs in place remain effective and to avoid visual clutter.[8]  (Id. ¶¶ 5, 9.)  On the other hand, John Smith, PE, MSEE, MSMBT, MSS, BSGP ("Smith")—a licensed professional

---

[8] See Dep't of Def., Unified Facilities Criteria ("UFC") 3–120–01, Design: Sign Standards, § 1-2 General https://www.wbdg.org/FFC/DOD/UFC/ARCHIVES/ufc_3_120_01_2014_c2.pdf ("Effective sign programs will reduce the number of signs on each installation to the absolute minimum required for directions, identification, and customer service.  This eliminates visual clutter and results in an efficient, cost-effective, and attractive system that creates a unified professional appearance for all military installations.") (version archived from October 7, 2014 change) (last visited Mar. 23, 2021).

engineer with expertise in accident reconstruction and prevention, civil engineering, and military construction—opined that the Subject Crossing should have been marked by a "ROAD MAY FLOOD" sign and flood gauge.  (Dkt. # 54-8 at 3.)  In support of his position, Smith cited a May 7, 2012 JBSA–Camp Bullis Comprehensive Traffic Engineering Study, which stated, "[i]n general, the signs are not consistent with the current [MUTCD]," but did not identify which provisions of the MUTCD were allegedly violated.  (Id.; Dkt. # 54-5 at 64–71.)  The study also found dozens of culverts and bridges to be in poor condition, and highlighted roads in the area of the Subject Crossing for their danger of flooding. (Id.)

As of October 30, 2015, the Subject Crossing was guarded by a "pedestrian handrail" but not a longitudinal barrier intended to keep automobiles on the road—like a guardrail.  (Dkt. # 52-2 ¶¶ 2, 6; see Dkt. # 54-7 (flood gauge added later).)  Plaintiffs point out that Smith believes this rail failed to meet the U.S. Department of Transportation ("DOT") Federal Highway Administration's ("FHWA") standard for guardrails.  (Dkt. # 54 at 5–6; Dkt. # 54-8 at 3–4.)  They also cite a 2019 Initial Bridge Inspection Report, which states that "[t]he guardrails [on the Subject Crossing] do not meet current Texas [Department of Transportation ("DOT")] standards."  (Dkt. # 54-6 at 5.)  At his deposition, Chief Gaffney stated that the railing may have been broken in such a way that it did not extend the

7

length of the Subject Crossing.  (Dkt. # 54-3 at 59–60.)  The Government cites a

declaration submitted by Dr. Charles Ishee ("Dr. Ishee"), a structural and

geotechnical expert for the Air Force Civil Engineer Center, in which Dr. Ishee

claims the Subject Crossing is part of an "access road"[9] that experiences traffic too

slow and low in volume to be subject to FHWA regulations and MUTCD barrier

requirements.  (Dkt. # 52 at 15–16; Dkt. # 52-2 ¶¶ 6–10.)  Dr. Ishee claims the

Subject Crossing is instead governed by discretionary standards from the Barrier

Guide for Low Volume and Low Speed Roads (Publication FHWA–CFL/TD–05–

009).  (Dkt. # 52-2 ¶ 6.)

### 4.  Barron on October 30, 2015

Barron customarily took Camp Bullis Road to reach his worksite on

Camp Bullis north of the cantonment area.  (Dkt. # 37 ¶ 13.)  On the morning of

October 30, 2015, Barron observed that Camp Bullis Road Crossing was closed

and proceeded to try the only alternative route to reach his worksite.  (Id. ¶¶ 14(n)–

(o).)  When Barron approached the Subject Crossing on the unnamed road, the gate

---

[9] Dr. Ishee cites UFC 4–010–01 in support of this contention.  See Dep't of Def.,
UFC 4–010–01, DoD Minimum Antiterrorism Standards for Buildings, § B–1.4,
Standard 4. Access Roads, https://www.wbdg.org/FFC/DOD/UFC/ARCHIVES/
ufc_4_010_01_2012_c1.pdf (version archived from October 1, 2013 change) (last
visited Apr. 1, 2021).  He claims the road is an access road to the water treatment
plant.  (Dkt. # 52-2 ¶ 4.)  The Government asserts that it also serves as a shortcut to
the firing range and provides an alternative north-south route across Camp Bullis
or for emergency evacuations.  (Dkt. # 52 at 16.)

was still open.  (<u>Id.</u> ¶¶ 14(o)–(r).)  At approximately 7:15 a.m., Barron attempted to cross the Subject Crossing in his small, red compact car.  (Dkt. # 52-4 at 61–62; Dkt. # 52-5 at 5; Dkt. # 54-3 at 49.)  The water current washed Barron's car off the road, and he subsequently died from asphyxia and drowning.  (Dkt. # 37 ¶ 14(t); <u>see</u> Dkt. # 54-3 at 31–32.)

### 5.  Procedural History

On November 14, 2018, Barron's parents Rogelio and Maria Barron ("Plaintiffs") filed this lawsuit, seeking to recover from the United States Government individually and on behalf of Barron.  (Dkt. # 1.)  They amended their complaint multiple times, most recently on January 17, 2020.  (Dkt. # 37.)  On September 30, 2020, the Government filed the instant Motion to Dismiss and, in the alternative, Motion for Summary Judgment.  (Dkt. # 52.)  On October 14, 2020, Plaintiffs filed a response in opposition to the motion.  (Dkt. # 54.)  On October 22, 2020,[10] the Government filed its reply.[11]  (Dkt. # 59.)

---

[10] The Court granted leave to exceed the page limit for each document (without objection for the motion itself and the response).  (<u>See</u> Dkts. ## 51, 53, 58.) Because the Government timely attached the proposed reply to its opposed motion for leave to exceed the page limit within seven days, the reply itself is timely.  <u>See</u> Local Rule CV-7(f)(2).

[11] Although the Court recognized the Government's purpose for exceeding the page limit was "to fully respond to arguments raised in Plaintiffs' [r]esponse," (Dkt. # 58 at 2), to the extent the reply may exceed that purpose, the Court will not consider *non-jurisdictional* arguments raised for the first time in the Government's reply.  <u>See</u> <u>Zimmerman v. City of Austin</u>, 881 F.3d 378, 394 n.5 (5th Cir. 2018).

<u>LEGAL STANDARD</u>

**A. Rule 12(b)(1)**

"Federal courts are courts of limited jurisdiction." <u>Gunn v. Minton</u>, 568 U.S. 251, 256 (2013). A federal court properly dismisses a case, or a cause of action, for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. <u>Home Builders Ass'n of Miss., Inc. v. City of Madison</u>, 143 F.3d 1006, 1010 (5th Cir. 1998). "[T]he burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." <u>Ramming v. United States</u>, 281 F.3d 158, 161 (5th Cir. 2001), <u>cert. denied</u>, 536 U.S. 960 (2002). The Court may resolve disputes about its subject matter jurisdiction based on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." <u>Id.</u>

**B. Rule 56**

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact," and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>see also</u> <u>Meadaa v. K.A.P. Enters., L.L.C.</u>, 756 F.3d 875, 880 (5th Cir. 2014). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Bennett v. Hartford Ins. Co. of Midwest</u>, 890 F.3d 597,

10

604 (5th Cir. 2018) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003)).

<u>DISCUSSION</u>

The Government presents two arguments for disposing of Plaintiff's case: (1) that unwaived sovereign immunity precludes the Court from exercising jurisdiction to hear the claims, and (2) that, in the alternative, the summary judgment evidence entitles the Government to judgment as a matter of law based on the Natural Accumulation doctrine.  The Court must first address arguments pertaining to its own subject matter jurisdiction because, without it, the case can proceed no further.  <u>Ruhrgas Ag v. Marathon Oil Co.</u>, 526 U.S. 574, 583 (1999).

**A. Sovereign Immunity and the FTCA**

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress."  <u>Freeman v. United States</u>, 556 F.3de 326, 334–35 (5th Cir. 2009) (citation omitted).  "Waiver of sovereign immunity is strictly construed, meaning uncertainty is decided in favor of the government."  <u>Tsolmon v. United States</u>, 841 F.3d 378, 382 (5th Cir. 2016) (citing <u>Willoughby v. United States ex rel. U.S. Dep't of the Army</u>, 730 F.3d 476, 480 (5th Cir. 2013)).  The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80, provides the exclusive waiver of sovereign immunity for tort claims against the United States.  28 U.S.C. § 2679(a); <u>see</u> <u>also</u> <u>id.</u> § 1346(b).  In passing the FTCA, however, Congress enumerated several "exceptions that block the FTCA's waiver of the Government's sovereign immunity."  <u>Campos v. United States</u>, 888 F.3d

724, 730 (5th Cir . 2018); <u>see</u> 28 U.S.C. § 2680. "If an exception applies, a plaintiff's FTCA claim is barred, and a federal court is without subject matter jurisdiction over the claim." <u>Id.</u> Therefore, "[c]ourts consider whether the FTCA applies via a Rule 12(b)(1) motion." <u>See Tsolmon</u>, 841 F.3d at 382.

One of the FTCA's exceptions is the "discretionary function exception," which preserves sovereign immunity for claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." <u>United States v. Varig Airlines</u>, 467 U.S. 797, 808 (1984). The Court applies a two-part test for this exception. <u>See</u> <u>Campos</u>, 888 F.3d at 731. First, the conduct the plaintiff alleges was tortious must be a "matter of choice." <u>Tsolmon</u>, 841 F.3d at 382 (quoting <u>Spotts v. United States</u>, 613 F.3d 559, 567 (5th Cir. 2010)). Second, the choice or judgment must be "of the kind that the discretionary function exception was designed to shield." <u>Id.</u> For the Rule 12(b)(1) jurisdictional inquiry, Plaintiff must allege a claim that is "facially outside of the discretionary function." <u>St. Tammany Parish ex rel. Davis v. Fed. Emergency Mgmt. Agency</u>, 556 F.3d 307, 315 n.3 (5th Cir. 2009); <u>see also</u>

Campos, 888 F.3d at 731 ("The plaintiff has the burden of establishing that the test is not satisfied.").

The Government claims the discretionary function exception to the FTCA bars Plaintiffs' claims.  "In order to determine whether an official's conduct was discretionary, [the Court] must first define that conduct."  Gonzalez, 851 F.3d at 545.  The challenged conduct underscoring Plaintiffs' claims fits into these four definitions: (1) failing to determine—by inspection or otherwise—whether to open or close the road to the Subject Crossing (or Camp Bullis generally), (2) leaving open and unguarded the gate to the Subject Crossing, (3) failing to install and maintain adequate guardrails on the Subject Crossing, and (4) failing to place a "Road May Flood" sign or a flood gauge on the road to the Subject Crossing.[12] (Dkt. # 54 at 1–2, 22–23.)  The Court applies the two steps to the four conduct candidates below.

1. Failing to *Determine* Whether to Open or Close the Road Leading to the Subject Crossing (or Camp Bullis Generally)

Plaintiffs argue that the Government had a mandatory duty to determine whether to open or close the road leading to the Subject Crossing on

---

[12] In its motion, the Government treats the first and second (in)actions as part of the same challenged conduct, but—particularly considering Plaintiffs cite two different provisions of Camp Bullis Reg. 350–1 for the conduct—the Court finds it more appropriate to separate the theories when analyzing the conduct.  (Dkt. # 52 at 11–14; see also Dkt. # 54 at 2.)

14

October 30, 2015, if not whether to close Camp Bullis generally.  (See, e.g., Dkt. # 37 ¶¶ 16(c), (d), (e), (f), (g).)  Regarding this challenged conduct, the Court agrees with the Government that Plaintiff's claim—to the extent it is rooted in the Government's failure to abide by Camp Bullis Reg. 350–1 ("Reg. 350–1") § 12.4(c)—is barred by the discretionary function exception to the FTCA.

      *i.  Step One*

Under the discretionary function exception's first step, "[i]f a statute, regulation, or policy leaves it to a federal agency to determine when and how to take action, the agency is not bound to act in a particular manner and the exercise of its authority is discretionary."  Spotts, 613 F.3d at 567.  "'The requirement of judgment or choice is not satisfied' and the discretionary function exception does not apply, however, 'if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow' because 'the employee has no rightful option but to adhere to the directive.'"  Id. (quoting United States v. Gaubert, 499 U.S. 315, 322 (1991)).  "In other words, the discretionary function does not apply if the challenged actions in fact violated a federal statute, regulation, or policy."  Id.

Plaintiffs claim that the Government's personnel violated a "mandatory directive[]" to "[d]etermine [whether] to close or open roads during inclement weather."  (Dkt. # 54 at 12.)  The directive, Reg. 350–1 § 12(c)(4) states:

15

> Floods.  Camp Bullis, including main roads, is susceptible to flash
> flooding.  Military Police and Range Control will determine when to
> close and open roads during inclement weather.  Units may not
> circumvent barriers due to safety precautions.  Units will move to
> higher ground and avoid low-water crossing sites.  If a unit is trapped,
> alternate egress routes may be requested from Range Control.

(Dkt. # 52-3 at 70.)  Because the directive states that "Military Police and Range

Control **will determine** when to close and open roads," Plaintiffs contend that

these actors violated the regulation by failing to make such a determination

regarding the road leading to the Subject Crossing (or as to Camp Bullis as a

whole) on the morning of October 30, 2015.  (Id. (emphasis added).)  The

Government argues (1) that section 12-4(c) does not require an individualized

determination regarding every road on Camp Bullis, and (2) that the provision does

not impose a mandatory "duty to determine" at all; rather, it identifies the relevant

decision-maker to whom *discretion* for that determination is afforded.  (Dkt. # 52

at 11–13; Dkt. # 59 at 5–7.)

Contrary to Plaintiffs' assumption, section 12-4(c) does not state

Military Police and Range Control "will close roads" or "will open roads" during

inclement weather;[13] nor does it state that they must make an individualized

---

[13] This alternative phrasing would be more analogous to the specific mandatory
directives in the cases Plaintiffs cite.  See Garza v. United States, 161 F. App'x
341, 344–46 (5th Cir. 2005) (citing post order directive "you will patrol the
recreation yard" and "[y]ou will monitor and inspect all security devices");
D'Antuono v. United States, Case No. 4:07-cv-123-Y, 2010 WL 2465493, at *1,
*5–6 (N.D. Tex. June 15, 2010) (noting defendant's agent was "required by post

determination regarding each road on Camp Bullis.  Plaintiffs inappropriately read

a "duty to inspect" into this requirement.  Instead, the provision places

discretionary responsibility in the hands of those actors.  In <u>Williamson</u>, the Fifth

Circuit analyzed similar "will determine" regulatory language within the context of

the discretionary function exception to the FTCA, treating the language as an

identification of the parties to whom discretion is delegated rather than as an

independent non-discretionary duty to "determine":

> Congress deemed that the relative experience and training of farmers
> and their prospects for economic success should be factors in
> determining loan eligibility.  The Secretary of Agriculture, in turn,
> decreed that the County Committee and the County Supervisor "will
> determine eligibility." 7 C.F.R. § 1910.4(c).  Unmistakably those
> officials are responsible for exercising the statutory discretion Congress
> gave to the Secretary.  <u>See</u> <u>Poolman v. Nelson</u>, 802 F.2d 304 (8th
> Cir.1986)[, <u>abrogated on other grounds by</u> <u>Westfall v. Erwin</u>, 484 U.S.
> 292, 296 (1988)].  We hold that all the appellees in this case [including
> the County Supervisor] had responsibility for the exercise of discretion
> within the meaning of § 2680(a).

<u>Williamson v. U.S. Dep't of Agric.</u>, 815 F.2d 368, 376 (5th Cir. 1987).  The same

is true here.  "By order of the Commander," section 12-4(c) identifies the Military

Police and Range Control—including Sergeant Goodlow and Officer Rogers

here—as the parties responsible for exercising discretion to open or close roads in

case of flooding.  (<u>See</u> Dkt. # 52-3 at 3, 70.)

---

order to 'inform [relevant staff] immediately of any concerns or changes in an
inmate's mood'").

The discretionary function exception can "exempt[] the decisions of government employees at every level, acting in the exercise of their discretion." Buchanan v. United States, 915 F.2d 969, 971 (5th Cir. 1990).  Because section 12-4(c) identifies those to whom discretion is delegated and does not impose a mandatory duty, Plaintiffs have not shown that the challenged conduct was not a "matter of choice," the Court must proceed to the second step.[14]  See Tsolmon, 841 F.3d at 382.

### ii.  Step Two

Under the second step, the Court must determine "whether the 'judgment is of the kind that the discretionary function exception was designed to shield.'"  Spotts, 613 F.3d at 568 (quoting Gaubert, 499 U.S. at 323).  The exception was intended to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort" and "protects only governmental actions and decisions based on considerations of public policy."  Id.  At one extreme, "it is universally acknowledged that the discretionary function exception never protects

---

[14] Plaintiffs' contention that Range Control may not have participated in the individual decisions made by Sergeant Goodlow and Officer Rogers misses the point because section 12-4(c) does not prescribe a particular manner in which the actors must make their discretionary decisions.  See 28 U.S.C. § 2680(a) (protecting sovereign immunity under the discretionary function exception "whether or not the discretion involved be abused").

against liability for the negligence of a vehicle driver." <u>Gaubert</u>, 499 U.S. at 336
(Scalia, J., concurring).  At the other end of the spectrum, decisions made by
federal regulators overseeing a savings and loan association's day-to-day
operations have been found to fit squarely within the exception.  <u>Id.</u> at 331–32.
The proper inquiry for this step is not whether the Government agent(s) *in fact*
engaged in a policy analysis engaging in the challenged conduct, but rather
"whether [the] decision was '*susceptible to* policy analysis.'"  <u>Id.</u> at 572 (quoting
<u>Gaubert</u>, 499 U.S. at 325) (emphasis added).

   The relevant question here is whether the decision to open or close the
road leading to the Subject Crossing (or Camp Bullis generally) during a flash
flood is "fraught with . . . public policy considerations." <u>Gibson v. United States</u>,
809 F.3d 807, 816 (5th Cir. 2016) (quoting <u>Cope v. Scott</u>, 45 F.3d 445, 449 (D.C.
Cir. 1995)).  This particular decision straddles two lines of Fifth Circuit precedent
regarding the discretionary function exception.  On one hand, according to the
Government, the determination contemplated by section 12-4(c) of Reg. 350–1
involves "the [G]overnment's decisions about when, where, and how to allocate
limited resources within the exigencies of an emergency." <u>Freeman</u>, 556 F.3d at
340.  In <u>Freeman</u>—which involved a challenge to how federal officials managed
relief and evacuation efforts in the aftermath of Hurricane Katrina—the Fifth
Circuit held that such "decisions regarding the feasibility, safety, and benefit of

mobilizing federal resources in the aftermath of a national disaster are grounded in social, economic, and public policy" and, therefore, "are the types of decisions that the discretionary function exception was designed to shelter from suit."  Id. at 340, 341; see also Spotts, 613 F.3d at 572–73 (making the same determination regarding a challenge in the aftermath of Hurricane Rita).  Under some circumstances, the Fifth Circuit has more broadly recognized that "both the evaluation of actual or suspected hazards, and the decision to proceed in a particular manner in light of those hazards, are protected discretionary acts, not subject to tort claims in the district court."  Ford v. Am. Motors Corp., 770 F.2d 465, 467 (5th Cir. 1985) (applying exception to claim based on the United States Postal Service's decision to sell jeeps to the public without warning of their propensity to roll over).

On the other hand, Plaintiffs cite decisions in which matters of routine property maintenance "that would be expected of any other landowner" have eluded the discretionary function exception.  See, e.g., Gibson, 809 F.3d at 813–17. In Gibson—which involved a plaintiff falling off a ladder while exiting a trailer owned and made available for auction by the Federal Emergency Management Agency ("FEMA")—the Fifth Circuit held that FEMA's decision for "how to allow customers access to trailers being offered for sale" did not fall within the discretionary function exception.  Id.  The court noted that, under the

circumstances, FEMA "operated as a commercial business and welcomed customers to its site as if it were managing a trailer showroom." Id. at 815.  In Gibson, the Fifth Circuit also favorably cited Third Circuit cases holding that "the discretionary function exception does not apply 'where the Government is aware of a specific risk of harm, and eliminating the danger would not implicate policy but would involve only garden-variety remedial measures,'" id. at 814 (quoting S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 340 (3d Cir. 2012); citing Gotha v. United States, 115 F.3d 176, 178–82 (3d Cir. 1997)), and a Ninth Circuit decision holding that the Bureau of Indian Affairs' ("BIA") failure to maintain its irrigation system was "not the kind of policy decision that the discretionary function exception protects," O'Toole v. United States, 295 F.3d 1029, 1037 (9th Cir. 2002).[15]

---

[15] In Gibson, the Fifth Circuit contrasted situations in which "the Government acts as the operator of a business" and might make ordinary property maintenance decisions that are not shielded by the exception, from those in which "the Government acts as landowner of wilderness," where its maintenance decisions are more tightly entangled with policy analysis.  Id. at 815; see generally Cope v. Scott, 45 F.3d 445, 451–52 (D.C. Cir. 1995) ("[The road] is not the Grand Canyon's Rim Drive, nor Shenandoah's Skyline Drive.  Here, the Park Service has chosen to manage the road [in Washington D.C.'s Rock Creek Park] in a manner more amenable to commuting through nature than communing with it.").  The conduct relevant to this section of the Order concerns both the road to the Subject Crossing and Camp Bullis generally.  Camp Bullis is 28,000 acres large, mostly undeveloped, and the road to the Subject Crossing experiences relatively low traffic as compared with other parts of the cantonment area.  (Dkt. # 52-4 at 73–74; Dkt. # 54-2 at 39; see Dkt. # 54-4 at 33.)  Thus, at least as it pertains to this

The Court finds this particular challenged conduct—deciding whether to close or open the road to the Subject Crossing or Camp Bullis generally—is subject to the discretionary function exception.  The Government claims that decisions to open or close roads or Camp Bullis generally warrant considering, among other things:

> the severity of the risk posed by a weather event to public safety, the cost and harm to mission objectives and readiness if Camp Bullis is not operable for trainings and operations, the need to maintain emergency evacuation routes, whether manpower and resources are available to effectuate the closure, and the safety of Camp Bullis employees in effectuating any closures, as well as the priority among various roads with the potential for closure.

(Dkt. # 52 at 13 (citing Dkt. # 53-4 at 34, 37–38, 72–74; Dkt. # 54-3 at 122–24).) Despite Plaintiffs' contentions otherwise (see Dkt. # 54 at 12 n.4), it is irrelevant what Sergeant Goodlow and Officer Rogers *actually* considered on the morning of October 30, 2015; instead, the key is what type of analysis to which their decision is *susceptible*.  In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (La. Plaintiffs), 713 F.3d 807, 810 (5th Cir. 2013).

The policy considerations recited in the Government's motion above show that this challenged conduct is susceptible to limited-resource emergency response decision-making, like that described by the Fifth Circuit in Freeman and

---

challenged conduct the Government's decision lies closer to the "landowner of wilderness" end of the "business-to-wilderness" spectrum.

Spotts.  The applicability of the discretionary function exception depends on the

nature of the actions involved, not the status of the actors.  Commerce & Indus.

Ins. Co. v. Grinnell Corp., 280 F.3d 566, 571 (5th Cir. 2002).  Although the scope

of the emergency from inclement weather is narrower than that involved in the

hurricane cases (Freeman and Spotts), "the [G]overnment's decisions about when,

where, and how to allocate limited resources within the exigencies of an

emergency are the types of decisions that the discretionary function was designed

to shelter from suit."  Freeman, 556 F.3d at 340; see also In re FEMA Trailer

Formaldehyde, 713 F.3d at 810–11 (holding that a challenge to FEMA's decision

to use emergency housing units in the aftermath of Hurricanes Rita and Katrina

was barred by the discretionary function exception).  Courts have held that the

same types of policy considerations apply during emergencies of a smaller scale.

In re Yellow Line Cases, 273 F. Supp. 3d 168, 175 (D.D.C. 2017) ("While the

emergency in this case was far smaller in scope than the 'national disaster'

considered in Freeman, the [G]overnment officials coordinating the response to the

smoke-filled train on January 12 were similarly tasked with making decisions

'susceptible to policy analysis.'").

       Additionally, Sergeant Goodlow testified in his deposition that the

road to the Subject Crossing—which is restricted to the public—leads downrange

to the "Impact Area" in which units shoot live rounds "at all different hours . . .

almost in all weather conditions . . . to simulate combat conditions."  (Dkt. # 54-2 at 74–75, 80, 88.)  Bearing on several of the policy factors the Government identifies, this fact distinguishes the road closure (or full base closure) decision from the types of "routine property maintenance" conducted by private landowners.  It also distinguishes Gotha, in which the Third Circuit found the discretionary exception inapplicable to the Navy's failure to build stairs or adequate lighting, in part, because the Navy's policy considerations regarding the potential effects to "military hardware" from such construction were completely unrelated to the challenged conduct.  See Gotha, 115 F.3d at 178, 181 ("This case is not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get.").  In fact, the Third Circuit recognized this exact distinction by citing the "obvious" difference between the strategic policy decisions involved in stair and lighting construction in between office trailers on the Naval base in Gotha and those involved in leaving the elevated platform of a nuclear launchpad at an Air Force training site unprotected by a wall or railing (despite being opened for public tours) so that the launchpad could "maintain operational realism,"—a decision the First Circuit found to fall within the discretionary function exception.  Ayer v. United States, 902 F.2d 1038, 1040, 1043 (1st Cir. 1990); Gotha, 115 F.3d at 182.

The access control decision underpinning the challenged conduct here implicates, among other things, "the cost and harm to mission objectives and readiness if Camp Bullis is not operable for trainings and operations."  (Dkt. # 52 at 13.)  Camp Bullis officials have the discretion to use the "Impact Area" for training rain or shine, and in fact do so.  (Dkt. # 54-2 at 74–75, 80, 88; see Dkt. # 52-3 at 18 ("The Range is operational 24/7.").)  On some occasions, the weather may convince officials to close the road to the Subject Crossing or the entire base to ensure the range remains operable for training and operations.  Other circumstances may convince officials not to close the entire base or even that road (which has been used for evacuation in the past).  If the Court were to entertain Plaintiffs' challenge to the determination at issue here, it would risk cabining discretion for when and how training and operations may be conducted on Camp Bullis, potentially intruding on mission objectives and readiness.  This is precisely the type of judicial second-guessing Congress precluded in the discretionary function exception to the FTCA.

In short, the challenged conduct—determining whether to close the road to the Subject Crossing or Camp Bullis generally—is both an emergency decision in response to a natural disaster with limited governmental resources and a decision implicating training and readiness operations for units on Camp Bullis, both of which are susceptible to economic, political and social considerations and therefore the conduct is protected from suit by sovereign immunity.

2.  <u>Leaving the Gate Open and Unguarded</u>

Plaintiffs also contend that unidentified Government agents opened and left unguarded the gate that restricts access to the Subject Crossing—meaning that the Government may have negligently failed to restrict access to the Subject Crossing at the time Barron approached in his car.  (<u>See</u> Dkt. # 37 ¶¶ 16(a), (b), (e).)  The Government does not contest that the gate was open when Barron approached, but argues this decision (made by one or more unidentified Government agents) was a discretionary choice susceptible to policy analysis and, therefore, shielded by the discretionary function exception to the sovereign immunity waiver of the FTCA (for many of the same reasons discussed in the preceding section).  The Court finds this decision is also barred by the discretionary function exception.

26

### i.  Step One

Plaintiffs argue that the Government had a "mandatory directive[]" to "[a]lways keep the gate [in front of the Subject Crossing] locked or guarded" pursuant to Camp Bullis Reg. 350-1 §§ 2-3(a) and (d), which pertain to restricted access to the "Range/Controlled Area/Impact Area."  (Dkt. # 54 at 4, 12; see Dkt. # 52-3 at 20.)  Plaintiffs misstate these requirements.  Section 2-3(d) states: "All Range/Control Area/Impact Area gates will either be locked or guarded by the unit using the area."  (Dkt. # 52-3 at 20.)  Section 2-3(a) notes that access into the Range/Controlled Area/Impact Area is restricted and that the area "is marked by warning signs and/or locked barriers."  (Id.)  Additionally, under this section, "[a]ll personnel requiring access must report to Range Control and coordinate the reason, destination, and routes to be used prior to their being allowed entry."  (Id.)

For purposes of step one of the inquiry related to this conduct—i.e., whether the Government's employees violated this regulation by leaving the gate open and unguarded—the Court sets aside testimony related to whether the gate should have been closed or guarded on the morning of October 30, 2015, for reasons other than the mandates of Reg. 350–1.  See Mayfield v. United States, 365 F. Supp. 3d 791, 798–99 (W.D. Tex. 2019) (noting the question under the discretionary function exception inquiry is not whether the action was actually negligent).  Section 2-3 clearly does not require the gate to be closed or locked at

all times.  Subsection (a) does not provide a mandate regarding the gate's position

and the directive from subsection (d) applies to "the unit using the area."  (Id.)

Plaintiffs—who bear the burden of proof—have not contended that any units at

Camp Bullis were "using the area" on the morning of October 30, 2015.

Therefore, they have not made a showing that the Government's agents violated a

nondiscretionary duty under Reg. 350–1 § 2-3 or any other governing authority[16]

by opening and failing to guard the gate, and the Court proceeds to the second step

of the analysis.

> ii.  *Step Two*

Plaintiffs contend that the Government "explicitly concedes that

leaving the gate open was unrelated to any determination to open or close roads

during inclement weather"—distinguishing this challenged conduct from the

Government's alleged failure to decide whether to close the Subject Crossing or

Camp Bullis itself.  (Dkt. # 54 at 10; see Dkt. # 52 at 13 n.10 ("Indeed, the

evidence suggests that the gate was opened some time prior to 6:15–6:45 a.m. on

the date of the accident, meaning that it was not opened as an evacuation route in

conjunction with the closing of Camp Bullis Road at approximately 6:55 a.m.").)

---

[16] See, e.g., Dkt. # 52-4 at 45 ("Q: So someone – and we don't know who – made
the decision to open the gate without your [(Sergeant Goodlow's)] knowledge.
A: Yes.  Q: [W]as that a violation of procedure?  A: No."); id. at 73 ("Q: [Were]
there any formal policy guidelines that you were aware of . . . that instructed
people when to open and close this gate?  A: No, not that I'm aware of.").

In reply, the Government notes that the gate was often opened to facilitate use of the Subject Crossing as an evacuation route in instances of inclement weather, as well as "to move equipment, to access the water treatment plant, and for other uses." (Dkt. # 59 at 3–4; see, e.g., Dkt. # 52-4 at 8, 24–25.) The Government discussed the same purported policy considerations from the preceding section (id. at 13; see supra at 22) within the context of this challenged conduct—which contributed to the same allegedly hazardous condition: the road to the Subject Crossing being left ungated and unguarded when Barron approached.

Again, it is irrelevant what the unnamed actors actually considered when they opened (or failed to close) the gate leading to the Subject Crossing. See Gaubert, 499 U.S. at 325; see generally Baum v. United States, 986 F.2d 716, 720–21 (4th Cir. 1993) ("[A] reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which would expect inherently to be grounded in considerations of policy."). Witnesses testified that the decision to open or close the gate depends on the need for an evacuation route during inclement weather (see Dkt. # 52-4 at 8), to move equipment or access the water treatment plant (see id. at 24–25), or to prevent injuries by restricting downrange access in case of live fire (see Dkt. # 54-4 at 73–74). Different actors may make these determinations under the given circumstances. In fact, at least three entities have keys to the gate: Range Control,

Civil Engineering, and the Fire Department (Dkt. # 54-2 at 39, 88), and perhaps others do as well (Dkt. # 54-3 at 16, 31).

Plaintiffs bear the burden of pleading a claim based on conduct that is "facially outside of the discretionary function." St. Tammany Parish, 556 F.3d at 315 n.3.  Yet here they rely on a misstatement of the section 2-3 requirements and the Government's apparent concession "that leaving the gate open was unrelated to any determination to open or close the roads during inclement weather."  (Dkt. # 37 ¶ 14(k); Dkt. # 54 at 10.)  They have not presented any arguments upon which the Court could conclude that any of the alternative reasons for opening or closing the gate—such as to move equipment, provide access to the water treatment plant, or control downrange access to prevent injuries in the "Impact Area" in case of live fire—would not involve the type of policy considerations subject to the discretionary function exception.  (See Dkt. # 52.)

Noting the absence of such a showing from Plaintiffs, the Court finds these decisions are susceptible to a policy analysis.  Plaintiffs do not contend the Government was acting as a business operator when its unidentified agents opened the gate.  See Gibson, 809 F.3d at 813–17; Salim v. United States, 382 F.2d 240, 241–42 (5th Cir. 1967).  Courts have generally not applied that framework in cases in which independent contractors access military installations.  See Gotha, 115 F.3d at 181–82; Shackleton v. United States, Case No. 1:13-cv-3135, 2016

WL 4573723, at *4–6 (W.D. La. Aug. 9, 2016), <u>report and recommendation adopted</u>, 2016 WL 4573980 (Aug. 31, 2016).  Nor is this a case in which the Government has relied solely on budgetary considerations for why the gate could have been open, <u>see</u> O'Toole, 295 F.3d at 1035–36, or cited arbitrary reasons, <u>see</u> <u>Shackleton</u>, 2016 WL 4573723, at *6 ("[T]here is little in common between the judgments of training armed forces for war, and deciding whether or not to bolt large tool chests to the floor to prevent tipping.").

The decision to open or close the gate leading to the Subject Crossing—regardless of the circumstances under which it was made—is "fraught with public policy considerations," <u>Gibson</u>, 809 F.3d at 816, such as those for public safety, <u>see</u> <u>Hix v. U.S. Army Corps. of Eng'rs</u>, 155 F. App'x 121, 125–27 (5th Cir. 2005), and military training, operations, and readiness, <u>see</u> <u>Ayer</u>, 902 F.2d at 1040.  When—as is the case here—the gate controls access to a downrange "Impact Area" and water treatment plant on an active military base established "to provide a place for [s]oldiers to train and prepare for combat" and that "boasts 20 live firing ranges" as part of its "a realistic training environment for almost any type of field training,"[17] opening or closing the gate is not simply a matter of property maintenance.  Gonzalez, 851 F.3d at 548; <u>Gibson</u>, 809 F.3d at 813–14;

---

[17] <u>See</u> Minnie Jones, <u>Camp Bullis – An Emerald City in the Rough</u>, (July 22, 2010, https://www.army.mil/article/42652/camp_bullis_an_emerald_city_in_the_rough#:~:text=Camp) (last accessed Mar. 30, 2021).

(Dkt. # 54-2 at 74–75, 80, 88).  Section 2680(a) precludes judicial second-guessing of policy-rich discretionary decisions—regardless of whether "[o]ne can argue that another policy . . . is more desirable."  Bowman v. United States, 820 F.2d 1393, 1395 (4th Cir. 1987).  At least on the facts asserted by Plaintiffs, opening or closing a gate that limits access to an active military base's downrange "Impact Area"—an area that theoretically could have been in use during the flash flood—is shielded by the discretionary function exception.

3.  Failing to Install and Maintain Adequate Guardrails

The next conduct Plaintiffs challenge is the Government's failure to equip the Subject Crossing with proper guardrails.  (See Dkt. # 37 ¶ 16(i).) Plaintiffs argue that, "since the [Government] placed a guardrail at the location of the [Subject Crossing], the guardrail was required to [but did not] comply with standards promulgated by the United States Department of Transportation [('DOT')] Federal Highway Administration [('FHWA')]," including those in the Manual on Uniform Traffic Control Devices ("MUTCD").  (Id.; Dkt. # 54 at 3.) The Court analyzes this decision under the same two steps of the discretionary function exception and concludes that the exception applies.

i.  Step One

The question for step one is whether the guardrail construction and maintenance—or lack thereof—violated federal regulations, thereby precluding

application of the discretionary function exception.  Citing the opinion of Dr.

Ishee, the Government argues that the FHWA regulations and the MUTCD "apply

to higher volume and higher speed roads," not to the unnamed road and the Subject

Crossing.  (Dkt. # 52 at 15; Dkt. # 52-2 ¶¶ 3–10.)  In response, Plaintiffs cite a

March 2019 report prepared by PRIME AE Group, Inc. based on an inspection of

the Subject Crossing, which concludes, among other things, that "[t]he guardrails

do not meet current Texas DOT standards" and recommends corrective actions "to

prevent the possible development of more serious or costly problems in the future."

(Dkt. # 54 at 5–6; Dkt. # 54-6 at 5.)  They also cite a May 7, 2012 Comprehensive

Traffic Engineering Study for Camp Bullis, which stated generally that "[p]roper

guardrail protection and illumination are needed to ensure safety and meet FHWA

MUTCD standards" and "recommended that culverts lacking either guardrail

protection or delineators (object markers) be upgraded to meet current FHWA

MUTCD standards."  (Dkt. # 54-5 at 75.)  Finally, Plaintiffs submitted an affidavit

from John Smith, PE, MSEE, MSMBT, MSS, BSGP, who provided an example of

what he described as a "compliant guardrail" which conformed to unspecified

"mandatory" FHWA standards, contrasting with the handrail in place over the

Subject Crossing.  (Dkt. # 54-8 at 3–4.)  In their response, Plaintiffs provided a

link[18] to an image of Smith's "compliant guardrail" on the FHWA's website, but the link—dated June 8, 1993 (and last modified Jan. 30, 2014)—also does not support Plaintiffs' contention that the "compliant guardrail" is a design the Government had no choice but to adopt for the rail over the Subject Crossing. (Dkt. # 54 at 6, 15–16.)

Although the facts underlying this case occurred over five years ago and this case was filed over three years ago, Plaintiffs have yet to identify any specific mandatory statutes, regulations, or policies that the Government violated by its handrail construction on the Subject Crossing.  In Gonzalez, the Fifth Circuit rejected a vague allegation from the plaintiff accusing the United States Forest Service of violating "Forestry Service Regulations" without citing any specific provisions allegedly violated.  Gonzalez v. United States, 851 F.3d 538, 541 (5th Cir. 2017).[19]  Likewise, Plaintiffs in this case claim the Government's guardrail over the Subject Crossing failed to comply with unspecified mandatory FHWA

_____

[18] U.S. Dep't of Transp., Fed. Highway Admin., Guardrail Transitions, T 5040.34 (last modified Jan. 30, 2014 https://safety.fhwa.dot.gov/roadway_dept/ countermeasures/reduce_crash_severity/barriers/techadvs/archive/t504034/figure7 b.cfm) (last visited Mar. 31, 2021).

[19] Plaintiffs' argument that the Government was required to meet (unidentified) "applicable standards" once it decided to construct the handrail on the Subject Crossing relies on a misreading of Gonzalez, 851 F.3d at 549–50.  And without any reference to a specific provision allegedly violated here, Greer v. United States, 333 F. Supp. 3d 631, 636–37 (W.D. La. 2018) (citing specific requirements from the applicable manual), is readily distinguishable.

standards (Dkt. # 54 at 6), citing a March 2019 study in which the reviewer found the guardrails "do not meet current Texas DOT standards"—a finding which neither asserts a violation of the standards in place on October 30, 2015, nor specifies which mandatory standards were allegedly violated (see Dkt. # 54-6 at 5). In short, nothing in the record identifies with any particularity a requirement violated by the Government by its guardrail design.  (See Dkts. ## 54-6, 54-6, 54-8.)

Under step one, it is Plaintiffs' burden to identify the violated mandatory duty to foreclose application of the discretionary function exception. Campos, 888 F.3d at 731 ("Campos, not the Government, must direct us to authority that the officer was required to allow Campos to remain upon being presented with an [Employment Authorization Document] under the circumstances of this case.").  Because Plaintiffs have not done so, the Court proceeds to step two.

ii.    *Step Two*

Courts have routinely held that decisions regarding the design, construction, and maintenance of guardrails involve the type of decisions that are shielded by the discretionary function exception.  See, e.g., Stepanian v. United States, Case No. 15-cv-3727, 2017 WL 105909, at *4–5 (E.D.N.Y. Jan. 10, 2017) (applying exception to challenge relating to signage, lighting, and placement of

35

roadway barriers at the Gateway National Recreation Area near Brooklyn's Belt Parkway); Metter v. U.S. Army Corps of Eng'rs, 9 F. Supp. 3d 1090, 1098–1102 (D. Neb. 2014) (shielding from tort liability decision to remove guardrails on road above Gavins Point Dam, pending their replacement); Rich v. United States, 119 F.3d 447, 451 (6th Cir. 1997) (barring challenge to decision to replace guardrail with same design after an accident in the same location over Wolf Creek Dam); Baum v. United States, 986 F.2d 716, 718 (4th Cir. 1993) (applying exception to challenges regarding design, construction, and maintenance of guardrails on a bridge over the Baltimore–Washington Parkway); Bowman v. United States, 820 F.2d 1393, 1395 (4th Cir. 1987) (protecting decision to omit a guardrail along Blue Ridge Parkway to leave the scenic vista unobstructed).

   In their response, Plaintiffs cite Cope v. Scott, a decision in which the D.C. Circuit distinguished Bowman while finding section 2680(a) does not shield the Government's decision not to place adequate warning signs around a particularly slick stretch of road.  (Dkt. # 54 at 16–18); Cope, 45 F.3d at 451–52. Finding that the Government chose to manage the road in question—an unexpectedly-busy one through Washington, D.C.'s Rock Creek Park—"in a manner more amenable to commuting through nature than communing with it," the Court concluded that the Government's decision not to warn drivers of the dangers inherent in that use does not involve the type of discretion the exception protects.

Id. at 452.  Nevertheless, in Cope the D.C. Circuit did not address a guardrail

challenge and, in fact, *upheld* the district court's application of the discretionary

function exception to the plaintiffs' challenge regarding the failure to make the

road itself less slick—which, like the decision to install an adequate guardrail,

affects the danger of the road itself, not how well-warned drivers are.  Id. at 450–

51; see Mayfield, 365 F. Supp. 3d at 799–801.

   Upon review, the Court finds the guardrail cases better capture the

type of policy analysis underpinning the challenged conduct here.[20]  The

Government's decisions regarding whether to install a guardrail or handrail over

the Subject Crossing, what materials to use, as well as how and when to maintain

that barrier are subject to the discretionary function exception.  While not all of the

guardrail considerations apply here, see Bowman, 820 F.2d at 1395 (noting the

Government's need to consider preservation of a scenic vista), the decisions here

involve policy-rich considerations regarding "sensitive environmental

considerations; anticipated traffic; weather considerations such as severe heat; the

risk of inclement weather, including flooding, snow, and ice; available materials;

and other engineering concerns," (Dkt. # 52 at 16 (citing Dkt. # 52-2 ¶¶ 6–10)), as

well as resource prioritization between infrastructure projects across the 28,000

---

[20] The Court revisits the signage determination from Cope below with respect to
Plaintiffs' challenge regarding the failure to install adequate signage in this case.

acres on Camp Bullis.  (See Dkt. # 54-5 at 70 (identifying dozens of culverts in poor condition on Camp Bullis).)  Accordingly, the Government has not waived sovereign immunity regarding claims related to this challenged conduct. Therefore, the Court lacks jurisdiction to hear such challenges from Plaintiffs.

    4.  Failing to Install a "ROAD MAY FLOOD" Sign or Flood Gauge

Finally, Plaintiffs challenge the Government's decision not to install a "ROAD MAY FLOOD" sign or flood gauge at the Subject Crossing.[21]  The Court applies the same two steps to assess its jurisdiction to hear challenges related to these decisions, which the Government claims are discretionary.

    *i.*    *Step One*

On Camp Bullis, the Government is required to conform to mandatory duties imposed by the MUTCD, including any that apply to sign placement. 32 C.F.R. § 634.4(h)(3).  However, in their live complaint (Dkt. # 37) and response to the instant motion (Dkt. # 54), Plaintiffs do not point to any specific provisions of the MUTCD that would have required the Government to install a "ROAD MAY FLOOD" sign or flood gauge at the Subject Crossing.  And while they made generalized allegations in their complaint referring to the MUTCD (see Dkt. # 37

---

[21] Although the Government installed both such warning signs after Barron's death, the Court does not consider the decision to take these subsequent remedial measures as evidence of negligence, culpability, design defect, or the need for such warnings on October 30, 2015.  See Fed. R. Evid. 407.

¶¶ 16(h)–(j)), their response to the instant motion does not posit that step one precludes application of the discretionary function exception to this challenged conduct.  (See Dkt. # 54.)  In his affidavit, Smith points to MUTCD § 2C.35 Weather Conditions Signs (W8-18, W8-18at, W8-18bt, W8-819, W8-19Atp, W8-21, W8-22, and W8-17-14T) while arguing that the Government was negligent in failing to install a "ROAD MAY FLOOD" sign or flood gauge given, among other things, its "awareness that the signage on the base was inadequate and not in accordance with the MUTCD on or before [May 7, 2012]."  (Dkt. # 54-8 at 33 (citing Dkt. # 54-5 at 64–71).)

But Smith concedes that these provisions do not impose any *mandatory* duties violated by the Government.  (Id.)  In relevant part, section 2C.35 provides:

Option:

The ROAD MAY FLOOD (W8-18) sign [] *may* be used to warn road users that a section of roadway is subject to frequent flooding.  A Depth Gauge (W8-19) sign [] *may* also be installed within a roadway section that frequently floods.

Standard:

*If used*, the Depth Gauge sign shall be in addition to the ROAD MAY FLOOD sign and shall indicate the depth of the water at the deepest point on the roadway.

(MUTCD for Streets and Highways (2009 Edition, last updated May 2012), Dkt. # 52-8 at 164 (emphasis added).)  Because Plaintiff has identified no specific

mandatory duty violated by the Government in failing to include a "ROAD MAY FLOOD" sign and flood gauge in the MUTCD or otherwise, the Court proceeds to step two.

        *ii.    Step Two*

        The Government argues that whether to install a "ROAD MAY FLOOD" sign or flood gauge is not only discretionary, but is also entitled to a "strong presumption" that the type of discretion involved is the kind protected by the discretionary function exception to the FTCA.  (Dkt. # 52 at 21–23.)  In Gaubert, the U.S. Supreme Court held that "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."  499 U.S. at 324.

        The Government points to several regulations to justify application of that "strong presumption" to the signage decisions here.  First, section 2A.04 of the MUTCD states that, as a guiding principle, "[r]egulatory and warning signs [as opposed to route and directional guide signs] should be used conservatively because these signs, if used to excess, tend to lose their effectiveness."  (Dkt. # 52-8 at 68.)  Next, the Government cites section 1-2 of Unified Facilities Criteria ("UFC") 3–120–01, Design: Sign Standards, which states that "[e]ffective sign programs will reduce the number of signs on each installation to the absolute

40

minimum required for directions, identification, and customer service.  This eliminates visual clutter and results in an efficient, cost-effective, and attractive system that creates a unified professional appearance for all military installations." UFC 3–120–01, § 2-1 (version archived from October 7, 2014 change) (last accessed Apr. 1, 2021).  These standards are intended to "simplify the design/procurement process and reduce construction/maintenance costs."  Id. Another section of UFC 3–120–01 provides that utilization of mandatory and prohibitory signs that inform visitors and personnel of, among other things, physical hazards "should be kept to the minimum number and size required to meet safety regulations and avoid visual clutter."  Id. § 3-6.

In response, Plaintiffs argue that these signage decisions are not susceptible to the type of discretion shielded by the discretionary function exception, citing Cope, 45 F.3d at 451–52.  (Dkt. # 54 at 16–18.)  Plaintiffs also assert that the Government understates its awareness that the Subject Crossing could be subject to flooding.  (See, e.g., Dkt. # 54-8 at 3 (noting "the presence of the [Subject Crossing] on a flood plain"); Dkt. # 54-3 at 14 ("I've [(Chief Gaffney)] seen water over the road [at the Subject Crossing] a couple of times.").).)[22]

---

[22] The Court notes the Government's disagreement.  Citing testimony from some witnesses, including that the Subject Crossing had been used as an emergency evacuation route when Camp Bullis Road had flooded in the past, the Government

The Court agrees with the Government that the "strong presumption" applies from these regulations.  The provisions from UFC 3–120–01 and the MUTCD are the type of discretion-authorizing regulations that "create[] a strong presumption that [the] discretionary act" in question "involves consideration of the same policies which led to the promulgation of the regulations"—such as eliminating visual clutter, encouraging "respect" for and maximizing the efficacy of warning signs, and reducing construction and maintenance costs.  See Dkt. # 52-8 at 68); UFC § 3–120–01, §§ 2-1, 3-6.  These factors, along with safety considerations for drivers like Barron who may have benefitted from such signage, implicate uniquely governmental policy decisions of the type the discretionary function exception was designed to shield.  See Dowell v. United States, Case No. 3:12-cv-601, 2016 WL 715786, at *4 (W.D. Ky. Feb. 22, 2016).  The policies also conform to the purposes for promulgating UFC 3–120–01 and the MUTCD.  (Dkt. # 52-1 ¶¶ 3–9.)

Finally, Cope is distinguishable on at least two grounds.  First, the location, purpose, and traffic volume of the roads at issue in that case and this one differ.  The road leading to the Subject Crossing serves multiple purposes, such as

---

contests the extent of its awareness of the Subject Crossing's susceptibility to flooding.  (Dkt. # 52-4 at 8, 24–25.)  Nevertheless, the Court accepts as true Plaintiff's version of the facts for the motion to dismiss and need not adjudicate that factual dispute.

providing access to the water treatment plant and "Impact Area" or functioning as

an alternate north-south route across Camp Bullis, including in some cases for

emergency evacuations.  (Dkt. # 52-2 ¶ 4; Dkt. # 54-2 at 38.)  This road is located

on an active military base, leads to an area actively used for military training

exercises at all hours and in virtually all conditions, and is ordinarily shielded by a

gate that restricts downrange access.  (Dkt. # 54-2 at 8, 36.)  The parties have not

submitted precise figures regarding the unnamed road's traffic load, but the

Government and Dr. Ishee characterize it as a "low-speed and low-volume road"—

a claim Plaintiffs do not contest.  (Dkt. # 52 at 15; Dkt. # 52-2 ¶¶ 6–10.)  By

contrast, in Cope, the D.C. Circuit noted that—despite the Government's intent for

the public not to use Beach Drive for commuting—the road "bec[a]me an

important commuter route connecting downtown Washington with its northern

suburbs" and "carries heavy traffic throughout the day."  Cope, 45 F.3d at 446

(noting the road was intended to "carry a maximum of 8,000 vehicles daily, but

recent estimates indicate that the average daily traffic on the stretch of road

involved in this case was between two and three times that load").  The D.C.

Circuit expressly relied on the nature of the road in holding that the failure to warn

of road slickness was not subject to the discretionary function exception and in

distinguishing other "failure to post warning signs" cases that were found to fall

within the exception.  Id. at 451–52 ("Here, the Park Service has chosen to manage

43

the road in a manner more amenable to commuting through nature than communing with it.").

Second, in Cope, the D.C. Circuit did not consider any discretionary regulations like those in UFC 3–120–01 (which could not have applied in Cope because the road was not managed by an arm of the Department of Defense) or the MUTCD that afford a "strong presumption" that the decisions were "based on the purposes that the regulatory regime seeks to accomplish," and are therefore shielded from suit.  Gaubert, 499 U.S. at 325 n.7; see Cope, 45 F.3d at 451–52. Here, "the very existence" of these regulations creates a strong presumption which Plaintiffs have failed to overcome.  The Government's decisions regarding whether to install a "ROAD MAY FLOOD" sign or a flood gauge are subject to the discretionary function exception and immune from suit.

Finding all challenged conduct underlying Plaintiffs' suit barred from suit by sovereign immunity, the Court **GRANTS** the Government's motion to dismiss (Dkt. # 52) and dismisses Plaintiffs' case without prejudice.

**B. Summary Judgment: Natural Accumulation Doctrine**

   Because the Court lacks jurisdiction over Plaintiffs' negligence claim as it relates to any of the challenged conduct (Dkt. # 37 ¶¶ 14–16), it need not reach the Government's summary judgment arguments.  Accordingly, the Court **DENIES AS MOOT** the Government's motion for summary judgment.  (Dkt. # 52.)

<u>CONCLUSION</u>

   For the reasons stated above, the Court **GRANTS** the Government's motion to dismiss.  (Dkt. # 52.)  Its motion for summary judgment is **DENIED AS MOOT**.  (<u>Id.</u>)  Because the dismissal results from the Court's lack of subject matter jurisdiction, the Court **DISMISSES** this case **WITHOUT PREJUDICE**. The Clerk of the Court is **INSTRUCTED** to **ENTER FINAL JUDGMENT** and **CLOSE** the case.

   **IT IS SO ORDERED.**

   **DATED:** San Antonio, Texas, April 5, 2021.

David Alan Ezra
Senior United States District Judge

45