# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROGELIO BARRON AND MARIA | § | |
| BARRON, INDIVIDUALLY AND ON | § | |
| BEHALF OF ANTHONY BARRON, | § | |
| DECEASED | § | CIVIL ACTION NO. SA-18-CV-01184- DAE |
|     Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| UNITED STATES OF AMERICA | § | |
|     Defendant. | § | |

## PLAINTIFFS' MOTION TO ALTER OR AMEND
## THE JUDGMENT DISMISSING THE CASE FOR LACK OF JURISDICTION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Rogelio Barron and Maria Barron, Individually and on Behalf of Anthony Barron, Deceased, Plaintiffs in the above-captioned action, files this Motion to Alter or Amend the Judgment Dismissing the Case for Lack of Jurisdiction and would respectfully show the Court as follows:

## PROCEDURAL HISTORY

1.      By decision and order dated April 6, 2021, the court determined that it lacked jurisdiction over Plaintiffs' claims concerning the death of their son, Anthony Barron, which occurred after he and his vehicle were washed off of a low water crossing on Camp Bullis, a military facility.

2.      Plaintiffs alleged that The United States of America was negligent in causing Mr. Barron's death because: **1.** Camp Bullis Security Forces failed to make a determination to close or open the low water crossing towards which Mr. Barron was traveling despite being required to do

so by Camp Bullis internal regulations and **2.** An open gate that allowed Mr. Barron to access the low water crossing was required by Camp Bullis internal regulations to be closed and locked.

3.      Plaintiffs also alleged that notwithstanding these mandatory internal policies, given Camp Bullis' configuration as a fully functioning little town, decisions to open or close roads and to put up signs and guardrails are not fraught with public policy considerations.

## THE MANDATORY RULES

4.      As a preliminary matter, Plaintiffs were not claiming that the United States of America had a duty to inspect low water crossings. Plaintiffs, instead, alleged that the Security Forces had a duty to determine to "open or close" the road on which the low water crossing was located. Nonetheless, they **did no**t make a decision to open the road, nor did they make a decision to close the road. **They made no decision at all**.

5.      Plaintiffs also respectfully request that the court reconsider the Plaintiffs' claim with regard to the gate.

6.      As part of this claim, Plaintiffs relied upon the following internal regulations:

> "**2-3. Range/Controlled Area/Impact Area Security**
> a. **The Range/Controlled Area/Impact Area is marked by warning signs and/or locked barriers**. Entry into the Impact Area is strictly prohibited without Range Control permission and possession of a key does not in any way imply free access. Unauthorized entry is a federal offense and those apprehended will be prosecuted. **All personnel requiring access must report to Range Control and coordinate the reason, destination, and routes to be used prior to their being allowed entry**.
> . . .
> d. **All Range/Control Area/Impact Area gates will either be locked or guarded by the unit using the area**."

(emphasis added) Camp Bullis REG 350-1 2-3. (a) & (d).

7.     According to The United States of America (an argument made by counsel, not through any witnesses), the phrase "by using the unit the area" qualified both the words "guarded" and "locked." And so, the United States of America (again by counsel) argued that Range/Control Area/Impact Area gates were only to be locked if a unit was using the Range/Control Area/Impact Area.

8.     This contention is not logical, it is inconsistent with the physical configuration of the gate, and it is inconsistent with testimony from the Defendant's own witnesses regarding the gate. Furthermore, this construction disregards the doctrine of the "last antecedent." *See generally Barnhart v. Thomas,* 540 U.S. 20, 26, 124 S. Ct. 376, 380 (2003) (under "the grammatical rule of the 'last antecedent' . . . a limiting clause or phrase . . . should ordinarily **be read as modifying only the noun or phrase that it immediately follows**.") (emphasis added); *see also Pleasant v. U.S. ex rel. Overton Brooks Veterans Admin. Hosp*., 764 F.3d 445, 450, n.7 (5th Cir. 2014).

9.     Camp Bullis REG 350-1 2-3 (a) makes the following clear about the area behind the gate:

> a. It is **restricted at all times**. (*See also* The United States of America's Motion to Dismiss at page 4);
>
> b. **Entry is prohibited at all times** (unless permission is given by Range Control).
>
> c. In order to get such permission, personnel seeking to use the area, without exception, "**must report to Range Control and coordinate the reason, destination, and routes to be used.**"
>
> d. Unauthorized entry will result in **prosecution**.

10.     Despite the foregoing, The United States of America would have the court believe that it was **not** Camp Bullis internal policy to utilize the surefire way to keep people out of a highly restricted area – **by requiring the gate that leads to it to be locked** even if a unit is not "using the area". If one accepts the Defendant's attorneys' construction of the rule, Camp Bullis' Security

Forces and Range Control would be required to use time, effort, and resources patrolling a highly restricted area to round up the unknowing trespasser. **Simply keeping the gate locked is a more efficient method of protecting the area**.

11.     Furthermore, the internal policies clearly contemplate that the gate will remain locked at all times. Consider the following language – "**possession of a key** does not in any way imply free access." (emphasis added) Camp Bullis REG 350-1 2-3 (a). If the default position of the gate was to be open, surely the language would read "*possession of a key or an open gate does not in any way imply free access*."

12.     Additionally, the following testimony has been given about the gate:

Q. Would that be the north side of the bridge?

A. That will be the east side of the bridge. And then there's one up before the sewer treatment plant or wastewater plant. That's a -- was a gate up there also.

Q. Was that gate open or closed?

A. It was partially open.

**Q. Is that gate normally closed?**

**A. Yes.**

**Q. Do you know if that gate by the waste treatment has a lock on it normally?**

**A. Yes**.

. . .

Q. And when you came to the gate, what did you observe?

A. That it was partially open.

**Q. Was it unlocked?**

**A. Yes. It was open.**

**Q. And that was something that was not normal correct?**

**A. Right**.

(emphasis added) (Thomas Gaffney, September 17, 2019 deposition. Page 25, Line 22 through Page 26, Line 7; Page 33, Line 25 through Page 34, Line 7)

> Q. And do you know if the road that the red car and the white truck were traveling down, if there are any gates on it?
>
> A. Yes.
>
> Q. Where is the gate located?
>
> A. Around that curve. Around the bend.
>
> Q. And around the bend near the water treatment plant?
>
> A. Yes, sir.
>
> **Q. And is that gate usually locked?**
>
> **A. Yes, sir**.

(emphasis added) (Martin Ingelston, September 24, 2019 deposition.  Page 100, Line 23 through Page 101, Line 8)

> Q. And the -- where you placed the circle, does that road have a name?
>
> A. I'm not sure what the -- I'm not sure what the name of that road is.
>
> Q. But you'd agree with me that it's off of Wilderness Trail.
>
> A. Yes.
>
> Q. And Wilderness Trail is also known as Range Road?
>
> A. Yes.
>
> **Q. The road that you circled, is it -- was it restricted in any way in October –**
>
> **A. Yes.**
>
> **Q. -- of 2015? Tell me about that.**

**A. There -- there's a -- there's a gate that they close and lock, so you couldn't – you can't get to that water treatment plant**.

(emphasis added) (Tracy Goodlow, November 22, 2019 deposition. Page 35, Line 7 through Line 24)

Q. Was it your intention at some point to check the [subject] low water crossing that's off Wilderness Trail/Range Road?

A. Honestly, <u>I probably would have not</u>, to be honest.

Q. Why not?

A. Because I wouldn't have thought about that one because we never hardly -- we very seldom go over there.

. . .

Q. Is that because it's a restricted area?

A. **Because of where it's at and it's -- and it's normally locked. But that -- you know, that was normally like some kind of chain or something there or something blocking it off**. But I couldn't tell you what was there that morning. I -- to be honest, **I probably wouldn't have went there**.

(emphasis added) (Jarvis Rodgers, November 22, 2019 deposition.  Page 41, Line 9 through Page 42, Line 14)

Q. Did you ever learn who did open that gate?

A. No, I didn't.

Q. Do you know who has access to open that gate?

A. Not off the top of my head. I don't know.

Q. On a typical day on Camp Bullis, sunny day, is 15 that gate open or closed?

A. It all depends on the sanitation people that need to bring something through, as far as heavy equipment, something like that.

**Q. But is it normally closed?**

**A. Yeah, it's normally closed.**

**Q. Is it normally locked?**

**A. Yes**.

(emphasis added) (Wayne Evans, February 11, 2020 deposition Page 25, Line 10 through Page 25, Line 22)

13.    **None of these witnesses testified that the gate is only locked when a unit is using the area**. In fact, Sergeant Goodlow's whole decision making on October 30, 2015 **was based on the assumption that the gate was locked** (because it normally is).[1] Now the United States of America wants the court to accept that this was a misguided assumption to make.[2]

14.    The United States of America has produced the following picture of the gate:



---

[1] Consider the following testimony from Officer Goodlow:

> Q. And at least in your mind, when Camp Bullis Road was blocked, you also knew that the one by the water treatment plant was probably blocked, too.
> A. Yes.
> Q. That gave you some comfort, in terms of timing, right?
> A. Yes.
> Q. That I could -- I have the time to go check he one that's west of here and make sure that one --well, withdrawn. I have the time to check the one that's west of here before I double back and check the one by Wilderness Road because at least I know that one is blocked off. That's what was going through your mind.
> A. Yes.

[2] In that vein, Plaintiffs recognize that sometimes the gate needs to be opened. However, the internal Camp Bullis policy clearly requires that it either be re-locked or guarded by the unit using the area if locking the gate is not practical.

The gate itself clearly contemplates that the sign "NO TRESPASSING. VIOLATORS WILL BE PROSECUTED" will be visible (hence requiring it to be closed) and unequivocal (hence requiring it to be locked even when a unit is not "using the area"). If the gate were left unlocked and open, the sign would not likely be visible to a vehicle operator passing through it.

15.     The rules of construction support Plaintiffs' interpretation of the policy. The relevant policy reads: "All Range/Control Area/Impact Area gates will either be locked or guarded by the unit using the area." Camp Bullis REG 350-1 2-3(d).

16.     Under the doctrine of the "last antecedent", the phrase "by the unit using the area" only qualifies the word "guarded." *See Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S. Ct. 376, 380 (2003); *see also Pleasant v. U.S. ex rel. Overton Brooks Veterans Admin. Hosp.*, 764 F.3d 445, 450 (5th Cir. 2014); *Johnson v. Manpower Pro. Servs., Inc.*, 442 F. App'x 977, 984–85 (5th Cir. 2011).

17.     In *Barnhart*, an applicant for disability (who also had been laid off) was denied benefits, because the Social Security Administration ("SSA") determined that she was still able to do her previous work as an elevator operator. The applicant argued that the Social Security Administration should have considered that elevator operators were becoming obsolete, relying on the following language: "An individual shall be determined to be under a disability only if . . . he is not only unable to do his previous work but cannot . . . . engage in any other kind of substantial gainful work which exists in the national economy." 540 U.S. at 23.

18.     The applicant argued that the phrase "which exists in the national economy" qualified both the phrase "other kind of substantial gainful work" and the phrase "previous work." Hence, the claimant argued that it was relevant that elevator operators were no longer part of the "national economy." 540 U.S. at 22. The Supreme Court disagreed.

19.   It held:

For the reasons discussed below, the interpretation adopted by SSA is at least a reasonable construction of the text and must therefore be given effect.

The Third Circuit's reading disregards—indeed, is precisely contrary to—the grammatical 'rule of the last antecedent,' according to which a limiting clause or phrase (here, the relative clause 'which exists in the national economy') **should ordinarily be read as modifying only the noun or phrase that it immediately follows** (here, 'any other kind of substantial gainful work'). See 2A N. Singer, Sutherland on Statutory Construction § 47.33, p. 369 (6th rev. ed. 2000) ('Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent'). While this rule is not an absolute and can assuredly be overcome by other indicia of meaning, **we have said that construing a statute in accord with the rule is 'quite sensible as a matter of grammar.'** *Nobelman v. American Savings Bank*, 508 U.S. 324, 330, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). In *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959), this Court employed the rule to interpret a statute strikingly similar in structure to § 423(d)(2)(A)—a provision of the Fur Products Labeling Act, 15 U.S.C. § 69, which defined " 'invoice' " as '"a written account, memorandum, list, or catalog ... transported or delivered to a purchaser, consignee, factor, bailee, correspondent, or agent, or any other person who is engaged in dealing commercially in fur products or furs."' 359 U.S., at 386, 79 S.Ct. 818 (quoting 15 U.S.C. § 69(f)) (emphasis added). Like the Third Circuit here, the Court of Appeals in Mandel Brothers had interpreted the phrase "'any other'" as rendering the relative clause . . . applicable to all the specifically listed categories. 359 U.S., at 389, 79 S.Ct. 818. This Court unanimously reversed, concluding that the 'limiting clause is to be applied only to the last antecedent.' Id., at 389, and n. 4, 79 S.Ct. 818 (citing 2 J. Sutherland, Statutory Construction § 4921 (3d ed.1943)).

An example will illustrate the error of the Third Circuit's perception that the specifically enumerated 'previous work' 'must' be treated the same as the more general reference to "any other kind of substantial gainful work." 294 F.3d, at 572. **Consider, for example, the case of parents who, before leaving their teenage son alone in the house for the weekend, warn him, 'You will be punished if you throw a party or engage in any other activity that damages the house.' If the son nevertheless throws a party and is caught, he should hardly be able to avoid punishment by arguing that**

**the house was not damaged. The parents proscribed (1) a party, and (2) any other activity that damages the house**. As far as appears from what they said, their reasons for prohibiting the home-alone party may have had nothing to do with damage to the house—for instance, the risk that underage drinking or sexual activity would occur. And even if their only concern was to prevent damage, it does not follow from the fact that the same interest underlay both the specific and the general prohibition that proof of impairment of that interest is required for both. **The parents, foreseeing that assessment of whether an activity had in fact 'damaged' the house could be disputed by their son, might have wished to preclude all argument by specifying and categorically prohibiting the one activity—hosting a party—that was most likely to cause damage and most likely to occur**.

540 U.S. at 26–28.

20.     As stated earlier, the intention of Camp Bullis is to keep the area restricted **at all times**. It makes sense that Camp Bullis would **specify** and **categorically** identify the most likely way to keep people out – **by keeping the gate locked at all times** – not just when a "unit is using the area."

**THE ALLEGED NEGLIGENCE IS NOT
FRAUGHT WITH PUBLIC POLICY CONSIDERATIONS**

21.     Camp Bullis' cantonment area is essentially a small town (not a vast wilderness). It is easy to patrol during early morning hours[3] and can be shut down in an hour. Therefore, the

---

[3] Security Officer James Aguilar, who was deposed while the motion was pending, testified as follows:

> Q. ··(BY MR. MCCONNELL) Now, sir, you said that part of your shift is spent patrolling the cantonment area. Is that correct?
> A. Yes, sir.
> Q. What -- what does that consist of?
> A. Just around all the buildings. ·· And then this side of the cantonment area, I stay clear of Range Control.
> On a midnight shift I don't go past that, for many reasons. I usually stay in the cantonment area, go up by the barracks area, go back, and then go back down to the main gate, or I stop at the desk.
> Q. And you were in a vehicle?
> A. Yes, sir.
> Q. So you're driving around, checking out for suspicious activity, things like that?
> A. Yes, sir, make sure everything's kosher within the cantonment area.

United States of America, for the purpose of liability herein, should be considered an ordinary landowner. *See Gibson v. United States*, 809 F.3d 807, 813 (5th Cir. 2016); *see O'Toole v. United States,* 295 F.3d 1029, 1035–36 (9th Cir. 2002); *Shackleton v. United States,* No. 1:13-CV-03135, 2016 WL 4573723, at *4–6 (W.D. La. Aug. 9, 2016, Magistrate Judge Perez-Montez), *report and recommendation adopted,* No. 1:13-CV-03135, 2016 WL 4573980 (W.D. La. Aug. 31, 2016).

22.    The roads throughout Camp Bullis are designed for the benefit of a range of people, including recreation seekers, hunters, landscapers, and janitors. Camp Bullis contains 176 signs, 65 of which were related to warnings. Clearly, the roads were intended to be "amenable to commuting" and thus decisions to place or not place signs and decisions to erect or not erect guardrails are not protected by the discretionary function exception. *See Cope v. Scott*, 45 F.3d 445, 451–52 (D.C. Cir. 1995).

## CONCLUSION

23.    It is respectfully requested that the court amend its judgment and allow this case to continue to trial. The evidence shows that Camp Bullis' internal policies and procedures required to The United States of America, to lock the gate regardless if a unit is "using the area." A properly locked gate would have prevented Anthony Barron's access to the low water crossing and **to determine what roads to open or close.** The United States of America failed to perform these set courses of action.

---

Q. **I like that word. So the -- How long did it -- would it take you to do, like, one round of patrol of the cantonment area, in the vehicle, make sure everything's kosher?**
A. **I don't know. Usually drive around for don't time myself. I'd say probably about a half an hour**. Because I usually swing around most of the buildings, go over by the dormitories. Sometimes I'll do a walk-through. And then I'll head back down to the main gate or, like I said, to the desk area.
Q. **So you can do -- you can do that patrol in a half hour?**
A. **Oh, easily, yes.**

Respectfully submitted,

**WINCKLER & HARVEY, L.L.P.**
4407 Bee Caves Road, Bldg. 2, Suite 222
Austin, Texas 78746
Telephone: (512) 306-1800
Facsimile: (512) 306-9442



By:   _____
Jay Winckler
State Bar No. 21754400
Email: jwinckler@wincklerharvey.com
Sean McConnell
State Bar No. 24109419
Email: smcconnell@wincklerharvey.com
**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

By my signature above I hereby certify that a true and correct copy of the foregoing discovery document has been delivered via facsimile, electronic filing, or certified mail, return receipt requested, to all attorneys of record, as follows:

John F. Bash
United States Attorney
James Gilligan
Assistant United States Attorney
Faith Johnson Lowry
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel: 210-384-7345
Fax: 210-384-7312

<u>DATED: April 27, 2021</u>