### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ROGELIO BARRON, INDIVIDUALLY AND ON BEHALF OF ANTHONY BARRON, DECEASED; AND MARIA BARRON, INDIVIDUALLY AND ON BEHALF OF ANTHONY BARRON, DECEASED;<br>　　　*Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>　　*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. SA-18-CV-01184-XR |

### <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

On this date, the Court considered the motion for summary judgment filed by Defendant United States of America (the "Government") (ECF No. 78), Plaintiffs' response (ECF No. 79), the Government's reply (ECF No. 80), and the parties' arguments at the hearing held on December 15, 2022. After careful consideration, the Court issues the following order.

### BACKGROUND[1]

Rogelio and Maria Barron, the parents of Anthony Barron, brought this action against the United States Government after their son, a civilian contractor, drowned on his way to work. His car was swept away by a flash flood at Camp Bullis, a 28,000-acre military training base outside of San Antonio, Texas. ECF No. 37 ¶ 8. About 90 miles of road run though Camp Bullis, including Wilkerson Road.[2] Part of Wilkerson Road has a low water crossing on a flood plain with a gate to block the crossing. *Id*. ¶¶ 10, 11.

---

[1] These facts are undisputed unless otherwise noted.

[2] The Government "disputes Plaintiffs' characterization of the unnamed access road that contained the Subject Cross as 'Wilkerson Road,'" (ECF No. 80 at 11) but acknowledges that this dispute is immaterial to the Court's analysis of its pending motion for summary judgment.

On the night of October 29, 2015, leading into the early morning of October 30, 2015, Camp Bullis experienced severe rain and flooding throughout the installation. *Id.* ¶ 14(a). That morning, United States Air Force ("USAF") Security Forces Officers Tracy Goodlow and Jarvis Rodgers were responsible for inspecting the low water crossings in Camp Bullis (including the one on Wilkerson Road) for flooding. They closed Camp Bullis Road, the main north-south thoroughfare through Camp Bullis, at approximately 6:55 a.m. due to the flooding. ECF No. 78-3, Goodlow Dep. at 11:18–21, 14:7–8, 15:6–9. After closing Camp Bullis Road, Security Forces began inspecting other roads for potential flooding. *Id.* at 19:8–19. They began by inspecting more-frequently traveled roads west of Camp Bullis Road. *Id.* at 19:22–25. While doing so, Security Forces received a report of a missing person. *Id.* at 21:3–11, 28:4–13.

That same morning, at approximately 7:15 a.m., Anthony Barron, a civilian contractor, was driving to work on Camp Bullis. It is likely that Barron saw that Camp Bullis Road was closed and chose to take Wilkerson Road instead because the gate on Wilkerson Road was open. *Id.* ¶¶ 14(n)–(o). While this gate was usually locked, it had occasionally been used as an alternative thoroughfare when necessary, such as when Camp Bullis Road was closed. ECF No. 78-2, Evans Dep. at 25:14–22, 26:2–5. There is no evidence in the record establishing when and by whom the gate was opened prior to Barron's approach.[3] Barron attempted to traverse the low water crossing in his vehicle but was swept away. *Id.* ¶ 14(t). He died from asphyxia and drowning. *Id.*

On November 14, 2018, Anthony Barron's parents, Rogelio and Maria Barron ("Plaintiffs") filed this lawsuit, seeking to recover individually and on behalf of Anthony Barron from the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), which

---

[3] Evidence shows that a Range Control employee, Mr. Evans, crossed the Subject Crossing between 6:15 and 6:45 a.m. that morning, and the gate was already pen, suggesting that it was open before Security Forces closed Camp Bullis Road at 6:55 a.m. *See* ECF No. 78-2, Evans Dep. at 9:6–11, 18:20–25; ECF No. 78-3, Goodlow Dep. at 14:7–8, 15:6–9. How much earlier the gate to the Subject Crossing was opened is unknown.

waives the Government's sovereign immunity in tort claims brought against government employees acting in the scope of their employment. ECF No. 1.[4] They claimed that the Government was negligent in failing to: (1) inspect, close, and lock the gate, or otherwise restrict access to the low water crossing, (2) warn Barron of potential flooding, and (3) install guardrails that may have prevented flood waters from sweeping away Barron's vehicle. The case was originally assigned to Judge Ezra.

On September 30, 2020, after the close of discovery, the Government filed a motion to dismiss under Rule 12(b)(1) for want of subject matter jurisdiction based on the "discretionary function exception" to the FTCA's waiver of sovereign immunity. The discretionary function exception retains the Government's sovereign immunity for claims based on a federal employee's performance of "a discretionary function or duty on the part of a federal agency." *Id.* § 2680(a). The Supreme Court has interpreted "discretionary functions" to include acts that "involv[e] an element of judgment or choice" insofar as they are *not* governed by mandatory federal regulations. *See United States v. Gaubert*, 499 U.S. 315 (1991). In the alternative, the Government moved for summary judgment based on Texas's natural accumulation doctrine. *See* ECF No. 52.

Addressing the motion to dismiss, Judge Ezra recognized four categories of challenged conduct: (1) Camp Bullis personnel's alleged failure "to determine—by inspection or otherwise—whether to open or close the road to the Subject Crossing (or Camp Bullis generally); (2) leaving open and unguarded the gate to the Subject Crossing; (3) failing to install and maintain adequate guardrails on the Subject Crossing; and (4) failing to place a 'Road May Flood' sign or a flood gauge on the road to the Subject Crossing." ECF No. 60 at 14. Judge Ezra granted the motion to dismiss under Rule 12(b)(1), concluding that the Plaintiff's claims were barred because each

---

[4] Plaintiffs amended their complaint multiple times, most recently with their Third Amended Complaint, the operative pleading. ECF No. 37.

category of challenged conduct was subject to the discretionary function exception. *Id.* at 44. Because Judge Ezra concluded that he lacked jurisdiction over Plaintiffs' claims, he did not reach the Government's argument as to the "natural accumulation" doctrine. *Id.* at 45. Plaintiffs filed a motion to amend the judgment, expanding on earlier arguments regarding the Government's duty to inspect, close, and lock the gate, or otherwise restrict access, which was denied. ECF Nos. 62, 65.

Plaintiffs appealed the dismissal of their case on the sole ground that the decision to close and lock the gate did not fall under the discretionary function exception, and the Fifth Circuit agreed. *Barron v. United States*, 31 F.4th 347, 350–51 (5th Cir. 2022). The key provision at issue on appeal was Camp Bullis regulation 350-1, §§ 2–3(d), which provides that "[a]ll Range/Control Area/Impact Area gates *will either be locked or guarded by the unit using the area.*" (emphasis added). Reasoning that "by the unit using the area" modified both "locked" *and* "guarded," Judge Ezra had concluded that the decision to lock the gate was discretionary because no unit was using the area at the time of the flood. ECF No. 60 at 28. The Fifth Circuit disagreed and held that "by the unit using the area" modified only "guarded." *Barron*, 31 F.4th at 350. Thus, because there was no unit using the area in the early hours of October 30, 2015, the gate was required to be locked. *Id.* This interpretation was confirmed by signage indicating that access to Camp Bullis was limited and by witness testimony suggesting that default position of the gate was "locked." *Id.* at 351. The Fifth Circuit reversed and remanded for further proceedings on April 13, 2022, *id.*, and the case was transferred to the undersigned shortly thereafter, *see* ECF No. 72.

At a status conference on August 18, 2022, the Court denied the Government's request to challenge the Fifth Circuit's determination that the locking of the gate was non-discretionary by

way of supplemental evidence pursuant to the law-of-the-case doctrine but granted the Government leave to file dispositive motions on any remaining issues.[5]

The Government subsequently moved for summary judgment, arguing that Plaintiffs' claim that the gate should have been locked sounds in premises liability, not general negligence, and, accordingly, fails as a matter of law under the natural accumulation doctrine. ECF No. 78 at 1. Plaintiffs dispute the Government's contention that the natural accumulation doctrine absolved it of liability, arguing that "the United States of America undertook a duty to control the conduct of base occupants and make base roads safe." ECF No. 97 at 2. In its reply, the Government argues that Plaintiffs' attempt to advance a novel theory of liability against the United States by recharacterizing their negligence claim as a claim for negligent undertaking is both procedurally improper and otherwise futile. ECF No. 80 at 1–2. Even if the Third Amended Complaint included a separate claim for negligent undertaking, the Government contends it would fail as a matter of law because it is inconsistent with the United States' existing duties as the landowner of Camp Bullis. *Id*. The Court heard oral arguments from the parties on the Government's motion for summary judgment on December 15, 2022, and took the motion under advisement.

---

[5] Neither the District Court nor the Fifth Circuit made any explicit finding regarding whether § 2-3(d) actually applied to the specific gate at issue in this case. Rather, they addressed whether the regulation was discretionary. Indeed, the District Court noted an absence of evidence regarding whether the Subject Crossing was within the "impact area," ECF No. 60 at n.3, but interpreted the regulation to preserve discretion without ever reaching whether § 2-3(d) applied to gate in question. The Fifth Circuit analyzed § 2-3(d) as "the key provision at issue[,]" *Barron*, 31 F.4th at 350, a premise that had been assumed for argument but has never been factually developed. The law of the case doctrine "comprehends things decided by necessary implication as well as those decided explicitly"—but "[a] position that has been assumed without decision for purposes of resolving another issue is not the law of the case." *Conkling v. Turner*, 138 F.3d 577, 587 (5th Cir. 1998); *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) (quoting 18B Charles Alan Wright, Arthur R. Miller, and Edward Cooper, Fed. Prac. & Proc. Juris. § 4478 (4th ed. 2015). The United States subsequently discovered that Camp Bullis personnel do not consider § 2-3(d) to apply to the gate at issue, but that the gates to which the regulation did apply were required to be locked or otherwise guarded at all times. During the August 18, 2022 status conference in this matter, the Court indicated that it did not intend to reconsider Defendant's jurisdictional arguments following the ruling on appeal, however. Accordingly, this factual development is excluded from the Court's analysis on summary judgment; that is, the Court assumes that § 2-3(d) to apply to the gate at the Subject Crossing.

**DISCUSSION**

I.   **Legal Standard**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II.    Analysis

### A.    Plaintiffs' General Negligence and Premises Liability Claims

The threshold issue is whether Plaintiffs' negligence claim is based on negligent conduct or premises liability.

In this context, a property owner is negligent when he or she fails to "do what a person of ordinary prudence in the same or similar circumstances would have . . . done." *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017). By contrast, premises liability arises from the duty "[a]n owner or occupier of land has . . . to use reasonable care to keep the premises under his control in a safe condition." *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985) (internal citation omitted).

In Texas, general negligence and premises liability claims are "separate and distinct theories of recovery, requiring plaintiffs to prove different, albeit similar, elements to secure

judgment in their favor." *United Scaffolding*, 537 S.W.3d at 471. They are not interchangeable; each theory requires certain proof and is subject to certain defenses. *Id.* ("Negligent-activity and premises liability claims 'involve closely related but distinct duty analyses.'") (quoting *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005)). Different circumstances will impact whether a person injured on another's property has one type of claim or the other against the property owner. *Occidental Chem. Corp. v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2015).

The Texas Supreme Court provides guidance in *Occidental* for how to distinguish between a general negligence claim and a premises liability claim: "When the injury is the result of a contemporaneous, negligent activity on the property, ordinary negligence principles apply. When the injury is the result of the property's condition rather than an activity, premises-liability principles apply." *Id.* (citing *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992)) (emphasis added). Put another way, negligent activity "encompasses a malfeasance theory based on affirmative, contemporaneous conduct" by the property owner, while premises liability "encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." *United Scaffolding*, 537 S.W.3d at 471 (quoting *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010)).

The Texas Supreme Court also provides pleading guidance in *United Scaffolding*, noting that "[c]reative pleading does not change the nature of a claim; if a claim is properly determined to be one for premises defect, a plaintiff cannot circumvent the true nature of the claim by pleading it as general negligence." 537 S.W.3d at 470–71. Courts are therefore required to examine a plaintiff's characterization of his or her claims to determine whether they contain contemporaneous negligent activity claims or premises liability claims. *Id.* at 480. While "negligent activity" claims are based on "affirmative, contemporaneous conduct by the owner that

caused the injury," premises liability claims encompass "non-feasance theories" based on the "owner's failure to take measures to make the property safe." *Id.* at 471. Courts are therefore tasked with analyzing whether a plaintiff's claims resulted from contemporaneous negligent action (resulting in a negligent activity claim) or an owner's failure to take measures to ensure the property is safe (a premises liability claim).

The Texas Supreme Court, applying this framework in *United Scaffolding*, had to determine whether a plaintiff's claims sounded in general negligence or premises liability. *See generally id.* The plaintiff in that case, a pipefitter, "slipped on a piece of plywood that had not been nailed down, causing him to fall up to his arms through a hole in the scaffold." *Id.* at 467. He claimed that the property owner created a dangerous condition and then failed to "adequately determine the dangerous conditions created," "correct the dangerous condition which existed with the scaffolding," "secure the scaffolding in a proper and safe work condition," and "warn 'that a dangerous condition existed.'" *Id.* at 472. The case was submitted to the jury on a general negligence theory, and the jury found against the property owner. On appeal, however, the Texas Supreme Court held that "the only fair reading of [plaintiff's] allegations is that his injury resulted from a physical condition left on the property—a hole in the scaffold platform, covered by an unsecured sheet of plywood—and not some contemporaneous activity. Therefore, on the question of whether [his] claim arises from a contemporaneous negligent activity or a condition on the property, we hold that [his] alleged injury arose from a premises defect." *Id*. at 473. The Court concluded that the plaintiff's claims sounded in premises liability and then examined whether the defendant, a general contractor, "may be subject to liability for breaching any duties that a property owner would owe to business invitees." *Id*. at 474.

Texas case law makes clear that courts should examine the time that elapses between alleged negligent conduct and an injury as a means of distinguishing "contemporaneous" negligence claims from premises liability claims. The measure of how much time has elapsed is a relevant inquiry because, "[a]t some point, almost every artificial condition can be said to have been created by an activity." *Keetch v. Kroger Co.*, 845 S.W.2d at 264. The Supreme Court of Texas made clear in that case that in order for a plaintiff to establish a claim for negligent activity liability, he must show close temporal proximity between the alleged negligent activity and the resulting injuries. The Supreme Court of Texas held in *Keetch* that a mere thirty minutes of time elapsed between when a grocery store had sprayed plants in the floral department and when the Plaintiff slipped on the floor in a pool of the spray was too much elapsed time for the claim to sound in general negligence. "There was no ongoing activity when [plaintiff] was injured." *Id.* What had caused the plaintiff's injuries was a condition "created by the spraying . . .but she was not injured by the activity of spraying." *Id.* Both *United Scaffolding* and *Keetch* therefore make clear that Plaintiffs' claim in this case sounds in premises liability rather than negligence.

The conduct at issue in this case supports the Court's conclusion that Plaintiffs' remaining claim is one for premises liability against the Government. At issue is the failure by Camp Bullis personnel to lock or guard the gate leading to the flooded culvert. Leaving the gate open and unguarded was not affirmative, contemporaneous conduct by the Government that caused the injury. Indeed, both parties agree that Barron was not injured by the "activity" of opening the gate, but rather by the rain and flooding. Barron's injuries and death were the result of "a physical condition left on the property . . . not some contemporaneous activity." *United Scaffolding*, 537 S.W.3d at 471–73. Therefore, Plaintiffs' claim should instead be categorized as a premises liability claim, based on the clear failure of Camp Bullis personnel to "take measures to make the property

safe" which ultimately led to Barron's vehicle being swept away in the flooding culvert and his ultimate drowning.

In light of its determination that Plaintiffs' remaining claim sounds in premises liability, the Court agrees with the Government that the claim is barred by the natural accumulation doctrine. The natural accumulation doctrine bars premises liability claims caused by naturally occurring conditions like ice, rain, and mud, by negating the second element of a premises liability claim—proof of an "unreasonably dangerous condition" on the property. *M.O. Dental Lab v. Rape*, 139 S.W.3d at 675–76 (Tex. 2004).

Because the flooded culvert was caused by heavy rain, which cannot pose an unreasonable risk of harm under the natural accumulation doctrine, the Government had no duty to use reasonable care in keeping the premises under its control in a safe condition. Plaintiffs' claim therefore fails as a matter of law.

To prevail on a premises liability claim under Texas law, a plaintiff must establish:

> "(1) that [the defendant] had actual or constructive knowledge of some condition on the premises; (2) that the condition posed an unreasonable risk of harm to [the plaintiff]; (3) that [the defendant] did not exercise reasonable care to reduce or to eliminate the risk; and (4) that [the defendant's] failure to use such care proximately caused [the plaintiff's] personal injuries.

*United Scaffolding*, 537 S.W.3d at 471 (internal citation omitted). Regarding the second element, unreasonable risk of harm, "Texas courts have consistently held as a matter of law that naturally occurring or accumulating conditions such as rain, mud, and ice do not create conditions posing an unreasonable risk of harm." *Walker v. UME, Inc.*, No. 03-15-00271-CV, 2016 WL 3136878, at *3 (Tex. App. June 3, 2016) (citing *M.O. Dental Lab v. Rape,* 139 S.W.3d 671, 675–76 (Tex. 2004)).

Plaintiffs' Third Amended Complaint alleged that "[i]n the early morning hours of October 30, 2016, heavy, sustained rain was occurring at Camp Bullis and the surrounding area." ECF No. 37 ¶ 14(a). Barron "was swept away by flood waters" ultimately "resulting in his death." *Id*. ¶ 14(t). Because the flooding and his subsequent death were caused by heavy rains, and because, under the natural accumulation doctrine, conditions like rain in this context do not pose an unreasonable risk of harm, Plaintiffs' premises liability claim fails because they cannot establish the second element of such a claim under Texas law—unreasonable risk of harm. Accordingly, Plaintiffs cannot establish that the Government had a duty to use reasonable care to eliminate the risk caused by the flooding.

Because Plaintiffs' negligence claim sounds in premises liability and is barred by the natural accumulation doctrine, the Court **GRANTS** the Government's motion for summary judgment (ECF No. 78) and **DISMISSES** Plaintiffs' claims for general negligence and premises liability.

### B.      Plaintiffs' Negligent Undertaking Claim

In their response brief and at oral argument, Plaintiffs argued that the claim for ordinary negligence asserted in the Third Amended Complaint encompassed the theory that the Government was liable for negligently undertaking to make the premises safe. *See* ECF No. 79 at 2 ("[T]he United States of America undertook a duty to control the conduct of base occupants and make base roads safe.").

While Texas law generally imposes no duty to take action to prevent harm, Texas courts "have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000) (citing *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392,

396 (Tex. 1991)). In this sense, negligent undertaking cases are similar to premises liability cases "in that the plaintiff seeks to impose a duty on another to take protective action based upon special circumstances or the relationship between the parties." *Id*. at 838. Indeed, a claim for negligent undertaking can serve as an alternative theory of liability when recovery on a claim for premises liability is unavailable. *See, e.g.*, *Wilson v. Tex. Parks & Wildlife Dep't*, 8 S.W.3d 634, 635 (Tex. 1999) ("[T]o prevail on a premises liability claim a plaintiff must prove that the defendant possessed . . . the premises where injury occurred. But a party who does not own, occupy, or control premises may nevertheless owe a duty of due care if it undertakes to make the premises safe for others.").

To state a claim for negligent undertaking, a plaintiff must adequately allege that (1) the defendant undertook to perform services that it knew or should have known were necessary for the protection of others; (2) the defendant failed to exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119–20 (Tex. 1976).

The Government argues that a theory of negligent undertaking is "inherently inconsistent with . . . [a] theory of premises liability . . . ." *Alexander v. Wal-Mart, Inc.*, No. SA-19-CV-0721-OLG, 2021 WL 1226565, at *4 (W.D. Tex. Mar. 31, 2021). To begin, a plaintiff advancing a negligent undertaking claim "must first demonstrate that a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist." *Id*.; *see also Torrington*, 46 S.W.3d at 838–39. This tension was addressed in *Alexander*, in which the plaintiff's premises liability claim centered on the theory that Wal-Mart owed her a duty by virtue of her status as an invitee. *Alexander*, 2021 WL 1226565, at *4. A duty was therefore not imposed where one otherwise

would not exist. Quite the contrary—Wal-Mart's duty already existed by virtue of its status as owner of the premises. Other cases in Texas have reach the same conclusion. *See, e.g.*, *De Sanchez v. Sporran EE, Inc.*, No. 13-08-00541-CV, 2010 WL 3420572, at *5 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2010, no pet.) (mem. op.) ("[A] negligent undertaking theory is not appropriate when a particular duty or contractual obligation already exists and liability can be governed within that standard.").

The Government argues that it is undisputed in this case that it owns, operates, and occupies Camp Bullis, and therefore its duty in this case can only be based on its ownership status—not on an undertaking in the absence of duty. The Government therefore contends that a duty has not been imposed where one otherwise would not exist and that, for this reason, Plaintiffs' negligent undertaking fails as a matter of law. ECF No. 80 at 9. The Court disagrees.

As analyzed in the context of premises liability, the natural accumulation doctrine barred a finding of liability against the Government for claims caused by naturally occurring conditions like ice, rain, and mud, by negating the second element of a premises liability claim—proof of an "unreasonably dangerous condition" on the property. The natural accumulation doctrine therefore negated the Government's duty to use reasonable care to eliminate the risk. The Court held that the Government had no duty to use reasonable care in eliminating any risk caused by the accumulating rain and, accordingly, is not accountable under a theory of premises liability for its failure to do so. Because the Court therefore concludes that the Government had no duty stemming from its position as a landowner, it is possible to impose a duty on the Government where one would otherwise not exist by recognizing a claim for negligent undertaking.

As the Government correctly observes, however, Plaintiffs' Third Amended Complaint does not expressly allege a claim for negligent undertaking. ECF No. 80 a 1; *see generally* ECF

No. 37. Raising this claim for the first time in response to the Government's motion for summary judgment is procedurally improper. It is well settled in the Fifth Circuit that "[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.,* 895 F.2d 1073, 1078 (5th Cir. 1990)); *Jackson v. Gautreaux*, 3 F4th 182, 188 (5th Cir. 2021) (holding plaintiffs' claim that sheriff "failed to adequately train his officers to deal with mentally unstable individuals" was not properly before the court where the complaint alleged the sheriff "failed to adequately train his officer to avoid excessive force").

Still, the Federal Rules of Civil Procedure permit liberal amendment of pleadings. Rule 15(a) provides that "a party may amend its pleading with . . . the court's leave" and that "[t]he court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Accordingly, a district court must have a "substantial reason to deny leave to amend." *Chupka*, 2021 WL 2722812, at *6 (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. 1981)). In making that determination, courts examine the following considerations: "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003)).

The Court does not perceive any undue delay, bad faith, or dilatory motive in Plaintiff's failure to explicitly allege a claim for negligent undertaking in its pleadings. While this action was filed several years ago, the Court is mindful that it was originally dismissed in July 2021 for want of subject matter jurisdiction and subsequently closed for nearly a year before being remanded by the Fifth Circuit in June 2022. *See* ECF Nos. 60, 69. In other words, the Court did not have occasion

to address the substance of Plaintiffs' claims—or the deficiencies in their pleadings—until the Government filed its motion for summary judgment in September 2022. *See* ECF No. 78.

Moreover, there is no reason to believe that the Government will be prejudiced by the addition of this theory of liability at this stage of the proceedings, for at least two reasons. First, Plaintiffs' operative pleading alleges sufficient facts to support their claim for negligent undertaking and, accordingly, have already been the subject of discovery. Thus, it is unlikely that an amended complaint will require much additional discovery, if any. Second, while Plaintiffs have not explicitly alleged a negligent undertaking claim, the Government cannot plausibly allege that it would be unfairly surprised by such a claim because the theory is implicit in the discretionary function analyses conducted by Judge Ezra and, later, by the Fifth Circuit, which relied on their respective interpretations of the gate-locking requirements set forth in regulation 350-1, § 2-3(d).

Nonetheless, the Court concludes that leave to amend is not warranted in this case because it would be futile. As explained below, while the Court agrees with Plaintiffs that the Government undertook a duty to inspect low water crossings on Camp Bullis and protect base occupants from flooding, the record indicates that the gate-locking regulation at issue does not provide evidence of either the duty that the Government assumed or the proper standard of care.

"[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). In deciding the duty element of a negligent undertaking theory, courts must ask whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist, *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam), considering "several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding

against the injury, and the consequences of placing the burden on the defendant." *Phillips*, 801 S.W.2d at 525.

Plaintiffs have sufficiently alleged facts supporting their theory that the Government attempted to control the conduct of base occupants at Camp Bullis. Plaintiffs allege, for example, that Security Forces "inspected and then determined that the Camp Bullis Road Low Water Crossing should be closed due to water conditions and blocked and/or otherwise closed access to it." ECF No. 37 ¶ 14(e). Security Forces then "inspected low water crossings upstream from the Camp Bullis Low Water Crossings . . . [which] were then blocked and/or otherwise closed to water conditions." *Id*. ¶ 14(g). Finally, Plaintiffs allege that:

> Fort Sam Houston and/or Camp Bullis' security forces had the duty and responsibility to determine if water on low water crossings reach or could reach a level that created an unreasonable risk of wash-offs and other dangers to drivers and, if so, had the duty and responsibility to close, block, and otherwise restrict access to low water crossings.

*Id.* ¶ 14(c). The Government does not dispute that Security Forces undertook to inspect low water crossings and control base occupant movement and access to certain roads during the heavy rain. Moreover, there is ample evidence that the Government regularly undertook efforts to protect base occupants from flooding. *See, e.g.*, Camp Bullis 350-1 § 12-4 (indicating that Camp Bullis' range control was to monitor "the local weather and . . . issue SEVERE WEATHER WARNINGS to all units training on Camp Bullis as required."); *Id.* § 12-4(c) (charging Camp Bullis' security forces officers with opening and closing roads during inclement weather).

These actions are indicative of the Government's awareness of the risk, foreseeability, and likelihood of potential injury from flooding—behavior that the Government's conduct the morning of October 30, 2015 was aimed to prevent. The Court concludes that the magnitude of the burden of guarding against this type of injury resulting from flood is not so high as to outweigh the

consequences of placing the burden on the Government. Accordingly, the Court is satisfied that the Government undertook a duty to control access to Camp Bullis and protect base occupants from flooding.

Further, Plaintiffs have alleged facts sufficient to support the reliance element of a claim for negligent undertaking. Specifically, the Third Amended Complaint alleges that "Anthony Barron reasonably believed the Subject Low Water Crossing was safe and/or suitable because it was unblocked[.]" ECF No. 37 at 6.

Nonetheless, the Court is not convinced that the Government was negligent in failing to lock the gate at the Subject Crossing, in violation of regulation 350-1, § 2-3(d). The mere existence of a statute, regulation, or policy governing the conduct of a federal employee does not render such conduct non-discretionary. *See Gaubert*, 499 U.S. at 324. The issue is whether those directives allow the employee to exercise judgment and choice, or whether they "specifically prescribe[ ] a course of action for an employee to follow." *Id.* at 322. It follows that assessing whether a government employee's conduct was discretionary in nature requires a detailed examination of the statutes, regulations, and policies in question. The inquiry would hardly be worthwhile, however, if an employee's failure to comply with the directives in question could never create liability for the Government.

In locating the basis for such liability, litigants and courts must look not to the FTCA or to federal regulations but to state tort law. *See Hornbeck Offshore Transp. LLC v. United States*, 569 F.3d 506, 509 (D.C. Cir. 2009) (quoting *Art Metal—U.S.A., Inc. v. United States*, 753 F.2d 1151, 1157 (D.C. Cir. 1985)) ("[I]t is a 'well-established principle that the violation of a federal statute or regulation by a government official does not itself create a cause of action under the FTCA.'"). This is because, by its very terms, the FTCA "*does not create new causes of action*; rather, it makes

the United States liable in accordance with applicable local tort law." *Art Metal.*, 753 F.2d at 1157

(citing *Birnbaum v. United States*, 588 F.2d 319, 327–28 (2d Cir. 1978)) (emphasis added). This

principle "does not create a bright-line rule that violation of a federal statute can never form the

basis of an FTCA claim." *Talley v. United States*, No. 11–01180 (RBK/KMW), 2013 WL

1314414, at *4 (D.N.J. Mar. 28, 2013). "Instead, the 'negligent performance of (or failure to

perform) duties embodied in federal statutes and regulations may give rise to a claim under the

FTCA, but *only* if there are analogous duties under local tort law.'" *Id.* (quoting *Art Metal*, 753

F.2d at 1157 (emphasis in original)). Thus, federal statutes and regulations "may provide evidence

that the government has assumed duties analogous to those recognized by local tort law" or "may

provide the standard of care against which the government's conduct should be assessed." *Zelaya*

*v. United States*, 781 F.3d 1315, 1324–25 (11th Cir. 2015).

The Court is not convinced that § 2-3(d) provides evidence of the Government's

undertaking in this case or the appropriate standard of care. While this gate itself could have been

used to prevent access through the low water crossing during heavy rain, the gate-locking

requirement may have been implemented for any number of reasons aside from flood protection—

e.g., preventing members of the public from entering Camp Bullis and injuring themselves,

stealing or destroying Government property, or assaulting base personnel. Thus, the mere existence

of the regulation is not evidence of the Government's undertaking to protect base occupants from

flooding. Further, the evidence that the Subject Crossing had occasionally been left open and used

as an alternative thoroughfare when Camp Bullis Road was closed indicates that § 2-3(d) does not

provide the standard of care against which the Government's conduct should be assessed. *See* ECF

No. 78-2, Evans Dep. at 25:14–22, 26:2–5, ECF No. 37 ¶¶ 14(n)–(o) (acknowledging in the

operative complaint that "[i]t is likely that Barron saw that Camp Bullis Road was closed and

chose to take Wilkerson Road instead because the gate on Wilkerson Road was open."). In other words, if performing the undertaking with reasonable care would require, in some situations, the violation of a regulation, then the regulation cannot define the appropriate standard of care for that particular undertaking.

The Court agrees with Plaintiffs that the Government undertook to monitor low water crossings during inclement weather and to control access to Camp Bullis to protect base occupants from flooding. The Court further agrees with Plaintiffs that Barron likely relied on the Government having performed these duties when he entered Camp Bullis through the Subject Crossing. And there is evidence that the Security Forces Officers who inspected the roads on Camp Bullis on the morning of October 30, 2015, did not exercise reasonable care in performing their duties. Nonetheless, because the non-discretionary function—the regulation requiring that the gate at the Subject Crossing—does not provide evidence of or the proper standard of care for the Government's undertaking, permitting Plaintiffs to amend their complaint to add a claim for negligent undertaking would be futile. Given the procedural posture of this case, the Court is not in a position to consider other non-discretionary functions that may apply to these tragic circumstances.

## CONCLUSION

For the foregoing reasons, the Government's motion for summary judgment (ECF No. 78) is **GRANTED.** Plaintiffs' claims for general negligence and premises liability claim are **DISMISSED WITH PREJUDICE**. A final judgment pursuant to Rule 58 will follow.

It is so **ORDERED**.

**SIGNED** this 19th day of May, 2023.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE